**NORTHEASTERN GAS TRANSP. CO. et al. v. FEDERAL POWER COMMISSION.**

**BLACKSTONE VALLEY GAS & ELECTRIC CO. v. FEDERAL POWER COMMISSION.**

**FALL RIVER GAS WORKS CO. v. FEDERAL POWER COMMISSION et al.**

Nos. 10421, 10446, 10507, 10508.

United States Court of Appeals
Third Circuit.

Argued March 7, 1952.

Filed April 4, 1952.

As Amended April 22, 1952.

---

Charles V. Shannon, Washington, D. C., (Wheat, May & Shannon, Washington, D. C., Henry F. Holland, Baker, Botts, Andrews & Parish, all of Houston, Tex., James H. Rowe, Jr., and Corcoran, Youngman & Rowe, all of Washington, D. C., Francis J. Meyers, Philadelphia, Pa., on the brief), for petitioners Northeastern Gas Transmission Co. et al.

Francis R. Foley, Pawtucket, R. I. (Corcoran, Foley & Flynn, Pawtucket, R. I., on the brief), for petitioner Blackstone Valley Gas & Electric Co.

Ray C. Westgate, Fall River, Mass. (Buffinton, Crowther, Bogle & Westgate, Fall River, Mass., on the brief), for petitioner Fall River Gas Works Co.

David T. Searls, Houston, Tex. (Charles E. McGee, Washington, D. C., Burns, Blake & Rich, Boston, Mass., William Jerome Daly, Jr., New York City, Charles I. Francis, Houston, Tex., Charles I. Thompson and Ballard, Spahr, Andrews & Ingersoll, all of Philadelphia, Pa., W. D. Deakins, Jr. and Vinson, Elkins & Weems, all of Houston, Tex., J. Ross Gamble, Washington, D. C., R. Clyde Hargrove and Hargrove, Guyton, Van Hook & Hargrove, all of Shreveport, La., on the brief), for Intervenors.

Bradford Ross, Washington, D. C. (Lambert McAllister, Asst. Gen. Counsel, Bernard A. Foster, Jr., Asst. Gen. Counsel, Reuben Goldberg, Harry R. Van Cleve, Jr., Pascal B. Frazier, all of Washington, D. C., on the brief), for respondent Federal Power Commission.

Before MARIS, GOODRICH and Mc-LAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

These interrelated petitions bring before us for review, under Section 19(b) of the Natural Gas Act,[1] four orders of the Federal Power Commission concerning the supply of natural gas to certain communities in New England.

Northeastern Gas Transmission Company is a wholly owned subsidiary of Tennessee Gas Transmission Company. On August 24, 1949 it filed an application, under Section 7 of the Natural Gas Act, with the Federal Power Commission, for a certificate of public convenience and necessity to construct and operate a gas pipeline system with its main line running east from the New York-Massachusetts state border near Pittsfield, Massachusetts to near Boston, Massachusetts and a second line north from the New York-Connecticut border near Greenwich, Connecticut to connect with its west-east line near Springfield, Massachusetts. The application, as amended March 2, 1950, specifically proposed serving fifty-three named distributors in Connecticut, Massachusetts, New Hampshire and Rhode Island. It omitted eight distributing companies in Massachusetts (one of which, Worcester Gas Light Company, covered two communities, Worcester and Framingham) and two in Rhode Island. Those ten distributors had made no arrangements with Northeastern for gas service. Tennessee had its own application, filed with the Commission August 2, 1949, to increase the capacity of its pipeline system so that it could take care of the anticipated demands upon it to supply the west-east Northeastern line. Transcontinental Gas Pipe Line Corporation for the purpose of supplying Northeastern's south-north line with gas filed its application with the Commission on September 9, 1949 for a certificate for the construction and operation of a pipeline from near Doctor's Creek, New Jersey

to the New York-Connecticut point near Greenwich, Connecticut to there connect up with Northeastern. The Commission consolidated these applications (that of Transcontinental as far as it affected Northeastern).

On January 24, 1950, Algonquin Gas Transmission Company filed an application with the Commission which, as amended May 1, 1950, requested a certificate for the construction and operation of a pipeline system from near Lambertville, New Jersey which it would connect with the line of its sole gas supplier, Texas Eastern Transmission Corporation, to a point near Boston, Massachusetts. This was to serve Algonquin's contract distributors in New Jersey, Connecticut, Rhode Island and Massachusetts, others who had expressed their intention of being served by Algonquin and "certain other customers who can be served economically by [Algonquin's] pipeline system alone." In its later amended petition Algonquin named all its proposed customers. Texas Eastern on March 10, 1948 filed an application with the Commission for a certificate to take care of, among other things, its commitments to Algonquin. This was amended November 14, 1949 and May 5, 1950. On July 24, 1950 United Gas Pipe Line Company filed an application for the construction and operation of new pipeline facilities part of which were to furnish gas to Texas Eastern for delivery by the latter to Algonquin. The latter and Texas Eastern were permitted to intervene in Northeastern's proceedings. Northeastern, Tennessee and Transcontinental were allowed to participate in the Algonquin matter. Later, the Commission consolidated the Northeastern and Algonquin proceedings.

Testimony was taken on the Northeastern and Algonquin applications and was concluded with the exception of Algonquin presenting evidence of its gas supply. On August 7, 1950, on motion of the Commission's Staff Counsel, the intermediate decision procedure[2] was dispensed with as

1. 52 Stat. 821–833, as amended, 56 Stat. 83–84, 61 Stat. 459, 15 U.S.C.A. §§ 717–717w.

2. In accordance with the provisions of Sec-

tions 7 and 8 of the Administrative Procedure Act, 60 Stat. 237, 241, 5 U.S.C.A. §§ 1006, 1007, the Commission's Rules of Practice and Procedure provide that the

to *all matters* in the consolidated hearings involving the applications of Northeastern, Tennessee and Transcontinental and those issues and matters in the Algonquin application *"to the extent only that Algonquin Gas Transmission Company presently proposes to supply natural gas to the communities and to the distributing companies presently proposed to be served by Northeastern Gas Transmission Company."* (Emphasis supplied).

Thereafter, on October 4, 1950, the Commission issued its first opinion in the case bearing Number 201. It stated in that opinion that "Northeastern proposes in its application to construct and operate a pipe line system for the transportation and sale *to certain designated manufactured gas distributing companies in specified areas in the New England states* of the natural gas to be purchased by it from Tennessee and Transcontinental." (Emphasis supplied). It said that Algonquin "proposes the construction and operation of a pipe line system * * * into Connecticut, Massachusetts and Rhode Island for the purpose of transportation and sale of natural gas to *certain designated distributing companies in that part of New England, * * *."* (Emphasis supplied).

The Commission found that the evidence was convincing "that the public convenience and necessity requires adequate natural gas service in the New England area." It concluded "that this public need should soon be fulfilled," but found "that the issuance of a certificate either to Northeastern or to Algonquin *as applied for in the pending applications* will not provide adequate and satisfactory natural gas service to New England at a reasonable cost." (Emphasis supplied). It found that neither Northeastern nor Algonquin "has requested a certificate authorizing service to the entire area." It found that if Northeastern's project was approved the ten

above referred to New England distributors would be without natural gas. Said the Commission:

"We are concerned here with a public need and demand for natural gas service in New England generally— *not in a portion of that area and not by a few selected distributing companies in that area.* It is inconceivable that anyone desirous of promoting the public good should urge that we now authorize one engaged in a business affected with the public interest *to pick and choose whom it wishes to serve without proper regard for the public good. Nor should we authorize any applicant to render partial service when it is clear at the outset, as shown by this record, that its plans do not provide the full service to which the people of New England are entitled."* (Emphasis supplied).

The Commission went on to hold that public convenience and necessity requires adequate and satisfactory natural gas service at a reasonable cost in the New England area; that neither the application of Northeastern or Algonquin met that test. It then stated that the purpose of "making these findings now" was so that the applicants might present a proposal without delay that would "meet the public demand and need for natural gas in New England in the early future." It clearly indicated that it thought such a proposal could be and should be submitted "forthwith". On October 9, 1950, Northeastern submitted its proposal. It asked that the certificate it was requesting under its current application be allowed; that the one sought by Algonquin be denied because of the absence of gas supply proof; and said that it would undertake to present in a separate proceeding plans to service the entire New England area at a minimum cost by expanding its system. Also on October 9, 1950, Algon-

presiding examiner, upon conclusion of hearing, shall file a recommended decision which is subject to exceptions by counsel and review by the Commission in the manner and within the time provided (18 CFR Sections 1.30(b), 1.31). The Rules also provide however, that this intermediate decision procedure may be omitted,

with or without request or motion therefor, upon a finding by the Commission that due and timely execution of its functions imperatively and unavoidably requires such omission (18 CFR Section 1.30(c) (2)). The requisite finding was made by the Commission.

quin filed a supplement to its amended application asserting that it had endeavored unsuccessfully to have Northeastern formulate a joint proposal with it and suggesting that the New England area be divided between Northeastern and Algonquin or that it be authorized to serve all of the companies and communities in New England originally proposed to be served by it and Northeastern.

On November 8, 1950 the Commission issued its second opinion in the matter, No. 202, with accompanying order. This allowed certificates to Tennessee and Transcontinental to supply Northeastern with gas. It granted part of Northeastern's application and denied the balance. It referred to its request in opinion No. 201 for a plan to service all New England and said that "It is still our opinion * * * that the public interest would best be served through fully coordinated facilities free to secure gas from whatever sources of supply are best able to meet the large ultimate demands of New England for natural gas upon the most favorable terms and conditions." Later in the opinion it again referred to having indicated that one system for New England was possible and desirable. The Commission then stated that since the one system had not been presented, Northeastern would be allowed a portion of its application and that certain other named markets "should be served by Algonquin upon a showing by Algonquin that it has an adequate supply of natural gas to serve such markets." The Commission proposed to secure to New England the benefits in part, at least, of an integrated natural gas system, by conditioning the certificate to Northeastern and *"any certificate which may issue hereafter* authorizing additional service in New England, to require the establishment of interconnections with, and agreements for emergency interchange of gas with, any natural gas system or systems serving the area at wholesale." (Emphasis supplied). Northeastern accepted its certificate. No certificate was issued Algonquin.

On December 11, 1950 Algonquin moved to dismiss as intervenors in its application Northeastern, Tennessee and Transconti-nental. On December 18, 1950 hearings on the Algonquin matter were resumed with Algonquin broadening the scope of its proposition and asking to be allowed 20% more gas than previously. These moves were over the objections of Northeastern and Tennessee. On December 21, 1950 Northeastern filed its new application referred to in its proposal of October 9th. This covered the whole New England area. It asserted that as compared to the Algonquin project for the same service it would save $20,000,000 in construction costs and $3,000,000 annually. It represented that 92% service would be furnished more than one year before Algonquin could commence service. It alleged that under its contemplated system 97% of the gas customers in the entire New England territory could be properly taken care of. On December 29, 1950 Northeastern filed a supplement to its petition to intervene in the Algonquin-Texas Eastern application seeking to be allowed an allotment of gas from Texas Eastern in order to help fulfil the additional commitments it would have as a result of its new application. On January 9, 1951 Northeastern and its supplier, Tennessee, filed a joint motion for consolidation of their applications with that of Algonquin. It was stressed in that motion that the Northeastern, Tennessee and Algonquin applications were mutually exclusive and therefore should be heard together in order to dispose of them properly as the granting of one necessarily would result in the denial of the others.

On January 10, 1951 the Commission made three of the four orders of which complaint is made. The first of these dismissed Northeastern's application of December 21, 1950 as far as it covered the markets requested by Algonquin "without prejudice to its refiling should the pending application of Algonquin be denied." The second dismissed Tennessee and Northeastern as intervenors in Algonquin's proceedings for the reason that they "* * * no longer are in competition with Algonquin for natural gas markets * * *." The third order dismissed Northeastern's supplement to its petition to intervene of December 29, 1950 in the application of

Texas Eastern. Timely applications for rehearing on these orders were made in accordance with the Natural Gas Act procedure and were denied. Two of these were affirmatively denied. No action was taken on the third which was equivalent to denial. Northeastern, Tennessee, Algonquin and Texas Eastern being corporations organized and existing under the laws of the State of Delaware which is within this circuit, the orders were then brought here for review.

In the Algonquin application and those of its suppliers, Texas Eastern and United Gas, the Commission on January 10, 1951, dispensed with the intermediate decision procedure. On February 27, 1951 the Commission issued its opinion No. 206, with accompanying order dated February 26, 1951. This, among other things, granted a certificate of convenience and necessity to Algonquin. It authorized Texas Eastern to sell and deliver natural gas to Algonquin. It authorized Algonquin to deliver and sell natural gas in specified amounts to Fall River Gas Works Company and Blackstone Valley Gas and Electric Company. Applications for rehearing on the order in the above particulars were not acted upon which as has been stated is equivalent to denial. As to those particulars this order is here reviewed.

The Commission moved to dismiss the petition which seeks to review the denial by the Commission of the application of Northeastern to supplement its petition to intervene in the Texas Eastern proceedings and obtain authority to obtain some gas supply from Texas Eastern. The Commission also moved to dismiss the Fall River and Blackstone petitions. Decision on the three motions was reserved pending argument on the merits. Those three motions are now denied.

All of the issues before us arise out of matters which are admittedly within the jurisdiction of the Federal Power Commission under the Natural Gas Act. By Section 7(c) of that statute (with the exception of applications for grandfather clause certificates and for emergency certificates) in all applications for certificates of public convenience and necessity " * * the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons * * * ; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly". Subsection (e) provides that, with the exception of grandfather and emergency cases, " * * a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act, see 56 Stat. 84, and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

Under Section 7(c) Northeastern was entitled to a hearing on its application. Petitioners say that the application was dismissed without a hearing. The Commission and the intervenors contend that the hearing afforded Northeastern on its original amended application together with the hearing on the Algonquin application constituted a full hearing under 7(c) by the Commission of Northeastern's application of December 21, 1950. The Commission and the intervenors also take the position that the Commission's opinion No. 202 and its order of November 8, 1950, fully and finally disposed of the matters contained in the December application. Therefore, say the Commission and intervenors, though the doctrine of the Ashbacker case [3] is the law it is not applicable

3. Ashbacker Radio Corp. v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108.

to the present proceedings. The Supreme Court by Mr. Justice Douglas said in that decision, 326 U.S. at page 333, 66 S.Ct. at page 151, regarding a provision in the Federal Communications Act[4] similar to 7(c) of the Natural Gas Act:

" * * * We only hold that where two *bona fide* applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him."

We come then to the fundamental problem the answer to which is dispositive of these petitions. Were the hearings on Northeastern's original amended application and on Algonquin's amended application which resulted in opinion No. 202 and the order thereon, sufficient to satisfy the hearing requirement of 7(c) with respect to Northeastern's second application filed December 21, 1950? It should be noted that the entire second application was not dismissed but only that portion of it which was competitive and mutually exclusive. A minor part of the application admittedly non-competitive was set for hearing. As to that, Northeastern advised the Commission that it would be impractical for it to take care of that market alone.

Northeastern's first application, granted in part by No. 202, was not for the whole New England area and was never so intended. Nor was that of Algonquin. As the Commission found in No. 201:

"Each of these applicants [Northeastern and Algonquin] has requested a certificate authorizing it to serve only certain designated distributing companies. Neither has requested a certificate authorizing service to the entire area."

Northeastern specifically asked only to serve certain companies. It did not include ten important New England distributors for the reason that they had contracts with Algonquin. Nine of those companies were owned by Algonquin interests. Algonquin's project omitted twenty-seven companies. It was because neither company had presented a plan to service

New England with one integrated system, which the Commission strongly felt was required, that the Commission issued its No. 201 opinion and there said:

"We are making these findings now so that these applicants may present to the Commission without delay a proposal based upon evidence now of record which will meet the public demand and need for natural gas in New England in the early future. It is our belief that such a proposal can be submitted forthwith, and that, pursuant to the authority granted us by the Congress in the Natural Gas Act, we may take such action as will make natural gas service available in New England. The Commission is prepared to reopen the record for supplementary evidence if necessary."

Within five days of the issuance of the above, Northeastern had its requested proposal before the Commission. In it Northeastern asked that its pending application be allowed and that of Algonquin denied. It stated that it would submit a separate application to cover all New England. At that stage in the proceedings and up to and including November 8, 1950, when the Commission issued its No. 202 opinion and order, the ten companies excluded from Northeastern's application were not before the Commission for disposition under either the Northeastern or Algonquin applications. On August 7, 1950, on motion of its staff counsel, the Commission had dispensed with its intermediate decision procedure with respect to all of the issues involved in the Northeastern, Tennessee and Transcontinental applications and those items in Algonquin's petition "to the extent only that Algonquin Gas Transmission Company presently proposes to supply natural gas to the communities and to the distributing companies presently proposed to be served by Northeastern Gas Transmission Company." The ten companies were not included in those brought before the Commission for decision under its order of August 7, 1950 because they were not named in the Northeastern group petitions and the only Algonquin distribu-

---

4. Federal Communications Act, 48 Stat. 1064, 47 U.S.C.A. § 151.

tors coming under the order were those which had been also named by Northeastern.

The Commission strenuously endeavors to justify its action in allocating those ten distributors in No. 202 "even if it be concluded that the markets assigned to each of the applicants, Northeastern and Algonquin, were not within the purview of the authority sought in the applications" by citing as authority for such practice, Civil Aeronautics Board v. State Airlines, 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353. That case is of no help for it is an area decision with the awards "all in the general area covered by the consolidated hearings." The vital difference from that case in the matter before us is that the hearing which was held in the present issue concerned the assignment of specific distributors in the New England territory. The sought for area hearing was never allowed.

Up to and including the issuance of No. 202, Algonquin had not presented evidence as to its supply of natural gas. As already stated, the Commission had eliminated its intermediate proceedings with respect to those distributors sought by Algonquin who had been named in Northeastern's petition. In No. 202 the Commission reiterated its previous decision to that effect and said that it could not take any other action at that time with respect to Algonquin's application. It further stated that it could find whether the remaining markets in New England would provide an economic system for Algonquin which would be in the public interest and it did so find. It included in those markets the nine companies controlled by Algonquin which were not before the Commission under its order bringing up only those companies set out in Northeastern's application.[5] In No. 202, the Commission did not award any certificate of public convenience and necessity to Algonquin and neither the Commission nor the intervenors contend that that is the effect of No. 202. In that opinion the Commission repeated its conclusion set out at length

in No. 201 that a single coordinated plan of natural gas service for the New England area was preferable. It mentioned nothing about Northeastern's proposal to accomplish this by a separate application to be filed. On December 21, 1950, Northeastern filed its promised application which embraced all New England. This is attacked by the Commission as untimely and in bad faith.

Northeastern's first knowledge, as far as the record shows, of the Commission's wish that New England be serviced by a single system was on October 4, 1950 when the Commission in No. 201 pressingly requested a preliminary proposal from both Northeastern and Algonquin to that effect. Northeastern replied to this almost immediately. It asked that its pending application for named distributors be allowed and that Algonquin's application, which was also for particular customers, be denied and it stated that it would present a full New England service plan in an independent application. The Commission never advised Northeastern not to do this. By allowing a portion of Northeastern's first application, as it did in No. 202, the Commission in reality granted an important part of Northeastern's proposal. That company's second application, offering an integrated system by extending the distribution allowed it in No. 202 to the remaining New England distributors, represented a task of no mean proportions. It outlined enormous savings in construction costs and to consumers. It stated that it would furnish a service a year in advance of Algonquin. Among other things it asserted that its single system would save over 51,000 tons of badly needed steel. The application was filed while the Algonquin proceedings were still undetermined and within two and a half months after the Commission's request. The foundation of that second application was extension of the facilities allowed Northeastern in No. 202 which had only been filed a little over a month previous. The application was not untimely. Nor is

5. The tenth company, Worcester Gas Light, was awarded Northeastern though, as stated, service to that corporation had

not been requested by Northeastern and its allocation was not properly before the Commission.

there any legitimate inference from the record that it was in bad faith. As to this the Commission principally points to the fact that the application was filed a day after No. 202 became final. Assuming that such filing date was not altogether fortuitous it does not bespeak improper conduct by Northeastern. At most that corporation was seeking to retain the part of its original request for named distributors which had been granted. It had responded promptly and affirmatively to the Commission's suggestion that it come forward with a proposal to serve all of New England. In that very proposal Northeastern prayed that its first application be granted and its second application was based on an extension of the facilities allowed it by No. 202. The assertion of bad faith is without merit.

Unquestionably by its language in No. 202 the Commission did indicate that it would look favorably upon Algonquin's application should that company satisfy the Commission on its gas supply. But this was no bar to Northeastern in its Commission-requested integrated plan seeking to include those same markets. There is nothing in the natural Gas Act which allows distributors or territory to be barred to an applicant because another supplier has expressed its desire to service them but does not prove its ability to do so. The circumstances then existing would seem to have made it imperative for the Commission to hear Northeastern's plan including that part of it calling for service to customers which the Commission thought Algonquin might eventually supply. The asserted large savings in construction costs, service charges, scarce materials and time, presented by the application of December 21, 1950 was the exact objective for which the Commission had been striving. It called for careful examination. If its allegations were true it would mean that the Commission's desire for a coordinated, economical and satisfactory gas system to service New England would be realized shortly.

■ We find no sound basis for the argument that Northeastern's second application was a collateral attack on No.

202. Northeastern accepted No. 202. Its award thereunder was for some of the customers it had requested in its original application. Meanwhile in No. 201, as has already been gone into, the Commission had demanded a single system for New England. Northeastern complied with this by filing its second application. At that time No. 202 had been issued. Under it, ten distributors, vital to a New England pattern, had not been before the Commission for decision and could not have been validly allocated. In addition, the distributors on Northeastern's list whom the Commission had refused Northeastern and had intimated that it would give to Algonquin when and if the latter qualified, were in fact unassigned. The second application included both those groups. It contemplated extending the Northeastern facilities, which were necessary in servicing its No. 202 customers, to supply the two additional groups. Northeastern thus would function for the area in accordance with the Commission's strongly expressed thought. At least those were the allegations of the application. Those allegations had not been disposed of by the No. 202 opinion and order. We see no justification in the record for holding that they and the application which contained them were not bona fide. That second application and the then pending application of Algonquin were competitive and mutually exclusive. Northeastern on that application as a matter of right was entitled to the hearing called for by Section 7(c) of the Act.

The Commission's second order complained of terminated the intervention of Northeastern and Tennessee in the Algonquin proceedings. The pertinent part of that order reads:

"On December 21, 1950, Northeastern filed in Docket No. G–1568 an application for a certificate to serve the markets, among others, which are proposed in Docket No. G–1319 to be served by Algonquin. The Commission, as of the date of this order, has entered an order dismissing without prejudice so much of the application in

Docket No. G–1568 as relates to service of the markets proposed to be served by Algonquin.

"The Commission *finds*:

"(1) Tennessee and Northeastern no longer are in competition with Algonquin for natural gas markets, which was the sole ground upon which such parties were permitted to intervene in this proceeding, and their interventions should be dismissed."

\*　　\*　　\*　　\*　　\*　　\*

■ From the above, the dismissal of Northeastern and Tennessee as intervenors does appear founded on the Commission's earlier order of the same day (January 10, 1951) which had dismissed the application of December 21, 1950. Whether it was the sole cause is of no importance. As we have already said, the application should not have been dismissed without the statutory hearing. Northeastern and Tennessee (the latter under its own application) were competitors of Algonquin and entitled to be heard in the Algonquin proceeding. The petitioners contend, and we think rightly, that irrespective of the status of the above referred to applications the interventions should not have been terminated. Northeastern's application had been dismissed without prejudice. A subsequent denial of Algonquin's application would have enabled Northeastern's application to be filed again and decided. We agree that in those circumstances Northeastern and Tennessee were very much concerned with the Algonquin proceeding and should have been permitted to continue in it as intervenors.

The Commission also dismissed Northeastern's supplement to its petition to intervene in the Algonquin-Texas Eastern proceedings. By that supplement Northeastern asked that it be allowed to obtain from Texas Eastern some gas to assist it in supplying the additional customers it would have if allowed a certificate on its second application.

■ Since the second application was erroneously dismissed it follows, as we have indicated, that Northeastern's true status is that of a natural gas company which under 7(c) of the Act has applied for a certificate of public convenience and necessity and is entitled to a hearing on that application. The supplement to Northeastern's petition to intervene was quite in accord with and important to its position as set out in its second application. It should not have been dismissed.

Petitioners next object to the Commission's allowance of Algonquin's petition and to the authorization of Texas Eastern to furnish gas to Algonquin.

■ We have found that Northeastern has not as yet been given a hearing on its December 1950 application and that the application is in competition with Algonquin's. We have just seen that the intervention of Northeastern and Tennessee in the Algonquin-Texas Eastern application was erroneously terminated. As a consequence of that termination Northeastern was eliminated from participation in the further hearings in the Algonquin matter which were to be held commencing January 15, 1951 and was not allowed to orally argue its opposition to the Algonquin application at the Commission en banc hearing January 23, 1951. On February 27th the Commission issued its opinion and Order No. 206 awarding Algonquin a certificate as requested in its application and also a certificate to Texas Eastern authorizing that company to furnish gas to Algonquin. The direct effect of Paragraph C of No. 206 was to deny Northeastern its statutory hearing under 7(c) of its own competitive and mutually exclusive application. That paragraph of No. 206 should be set aside.

Since the portion of Texas Eastern's certificate allowed by No. 206 which authorizes it to make available to Algonquin certain maximum daily volumes of natural gas derived wholly from the certificate awarded to Algonquin by Paragraph C of the same opinion and order, it follows that such authorization should be eliminated from the Texas Eastern certificate.

Both Blackstone and Fall River were included in the utilities Algonquin was authorized to serve under the certificate granted it by Paragraph C of No. 206. The setting aside of Paragraph C of No. 206 gives Blackstone and Fall River all of

the relief appropriate at this stage of the proceedings. Their petitions need not be further discussed.

The following orders of the Federal Power Commission will be set aside and for nothing holden:

(1) The order entered in the Commission's Docket G–1568 on January 10, 1951.

(2) The order entered in the Commission's Docket G–1319 on January 10, 1951.

(3) The order entered in the Commission's Docket G–1012 on January 10, 1951.

(4) Paragraph C of the Commission's opinion and order No. 206 issued February 27, 1951.

Paragraph B of the Commission's opinion and order No. 206 issued February 27, 1951 will be modified by eliminating from the certificate of public convenience and necessity issued to Texas Eastern Transmission Corporation by said paragraph any authorization to Texas Eastern to sell and deliver natural gas to Algonquin Gas Transmission Company.

All of these matters will be remanded to the Commission for further proceedings not inconsistent with this opinion.