**CITY OF DALLAS et al.**
v.
**CIVIL AERONAUTICS BOARD et al.**
No. 11968.

United States Court of Appeals
District of Columbia Circuit.
Argued April 12, 1954.
Decided May 20, 1954.

Petition for Rehearing Denied
June 17, 1954.

Prettyman, Circuit Judge, dissented.

12. Cf. International Longshoremen's and Warehousemen's Union, Local 37, v. Boyd, 346 U.S. 804, 74 S.Ct. 43.

Mr. Thomas F. Daly, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Messrs. Joseph W. Wyatt, Samuel C. Caldwell, Harry A. Inman, Washington, D. C., and John R. Mahoney, New York City, were on the brief, for petitioners.

Mr. James L. Highsaw, Jr., Chief, Litigation and Research Division, Civil Aeronautics Board, Washington, D. C., with whom Messrs. Emory T. Nunneley, Jr., Gen. Counsel, Civil Aeronautics Board, and John H. Wanner, Associate Gen. Counsel, Civil Aeronautics Board, Washington, D. C., were on the brief, for respondent.

Mr. Charles H. Weston, Atty. Dept. of Justice, Washington, D. C., entered an appearance for respondent.

Mr. Cecil A. Beasley, Jr., Washington, D. C., with whom Mr. Dyer J. Taylor, Washington, D. C., was on the brief, for intervenors City of Fort Worth, Texas, and the Chamber of Commerce of Fort Worth, Texas.

Mr. Eugene B. Thomas, Jr., Washington, D. C., entered an appearance for intervenors City of Fort Worth, Texas, and the Chamber of Commerce of Fort Worth, Texas.

Mr. Robert W. Oliver, Washington, D. C., for intervenor Central Airlines, Inc.

Before EDGERTON, PRETTYMAN and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Central Airlines applied to the Civil Aeronautics Board for authorization to operate a new route segment between the terminal points of Fort Worth, Texas, and Oklahoma City, Oklahoma, via five intermediate points, one of which was Dallas, Texas. After full public hearing, the Board entered an order granting the requested authority, except that Dallas and Fort Worth, which are thirty-one miles apart, were treated as a single terminal point with this designation: "Dallas-Fort Worth, Tex. (to be served through the Amon Carter Air Field)." Amon Carter Field[1] is Fort Worth's newly constructed municipal airfield and is located approximately midway between Dallas and Fort Worth.

The Dallas Chamber of Commerce, an intervenor in the proceedings before the Board, and the City of Dallas, which, jointly with the Chamber of Commerce, filed an unsuccessful petition for recon-

---

1. Also known as Fort Worth International Airport.

sideration, are the petitioners herein. Their interest stems from a concern that Dallas will not be well served by Amon Carter, which is eleven miles farther from Dallas than is its own municipal airport, Love Field, and their apprehension lest the Board's action jeopardize Dallas' substantial investment in Love Field.

Petitioners first attack the Board's order on the theory that the Board is without statutory authority to require Dallas-Fort Worth to be served through Amon Carter. This contention derives from their view that airports must be considered "facilities" within the meaning of the fourth sentence of § 401(f) of the Civil Aeronautics Act,[2] which provides:

> "No term, condition, or limitation of a certificate shall restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service as the development of the business and the demands of the public shall require."

■ While, for reasons set forth in the margin,[3] we do not believe that "facilities" as there used embraces "air-

ports," there is no need to reach that question. For we agree with the Board that the present order, in providing that service to Dallas-Fort Worth shall be through Amon Carter, has not imposed a "term, condition, or limitation" on Central. Rather, it has merely described the "points" and the "service to be rendered," as expressly authorized by the first sentence of § 401(f), supra, which provides:

> "Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered * * *."

The temporary certificate issued by the Board, after describing the transportation authorized, states: "The service herein authorized is subject to the following terms, conditions, and limitations." The restriction of service to Dallas-Fort Worth through Amon Carter does not appear among such "terms, conditions, and limitations," but is found in the first part of the order, where the authorized transportation is described.

■ While, of course, the mere form of the Board's order would not be

2. 52 Stat. 977, 989 (1938), 49 U.S.C.A. § 481(f).

3. In support of their position, petitioners point to the definitions section of the Act, where, at § 1(7) and (8), the term "Air navigation facility" is defined as including "landing areas" and "airports." 52 Stat. 977 (1938), 49 U.S.C.A. § 401(7) and (8). However, elsewhere in the definitions section, at § 1(22), where "landing area" is defined, "facilities" is used to refer to things appurtenant to the airport rather than to the airport itself. 52 Stat. 979 (1938), 49 U.S.C.A. § 401(22). Since § 401(f), supra, speaks of "facilities" and not "air navigation facilities," we think that the statutory definitions, if anything, militate against rather than for petitioners' contention. Moreover, turning to Title IV of the Act, in which § 401(f) is included, we find that in at least one instance "facilities," as used therein, could not have been intended to incude "airports." Thus, § 404(a) makes it the duty of a certificated carrier "to provide safe

and adequate service, equipment, and facilities in connection with [the authorized] transportation". 52 Stat. 993 (1938), 49 U.S.C.A. § 484(a): Clearly, Congress did not intend for carriers to provide their own "safe and adequate" airports. On the other hand, the term "air navigation facilities" does not appear in Title IV, but is used in Titles III and VI where the Administrator of Civil Aeronautics, the Secretary of Commerce, and the Board are vested with broad power to establish, develop, and maintain "air navigation facilities," specifically including airports, and to regulate such "air navigation facilities" in the interest of safety. See 52 Stat. 985, 986, 1011 (1938), 49 U.S.C.A. §§ 451, 452, 455, 457. Had Congress regarded the word "facilities," without more, as embracing airports, it would not have devised and painstakingly defined a new term (i. e., "air navigation facility") when it sought to create and delimit a broad regulatory power encompassing, *inter alia,* airports.

controlling if its substance were in conflict with the terms of the Act, we find no such conflict. The Board has heretofore, without challenge, assumed and exercised a power of control over changes in airports by certificated carriers,[4] and it would be paradoxical, indeed, if the Board were without jurisdiction to designate the airport to be served in the first instance. Moreover, we think nothing in the Act precludes the certification of service to an airport as a "point," as the Board has done on several occasions.[5] The "air transportation" regulated under the certificate provisions of § 401 is defined by the Act as the carriage by aircraft of persons, etc., between *places*, and not necessarily between cities.[6] Since we believe the Board has authority to designate service to an airport as a point, it would be wholly anomalous to invalidate the present order because, in form, it does not designate Amon Carter, itself, as a terminal point.

Finally, even if the Act left some ambiguity concerning the Board's power to enter the order in question, we would favor the broader view of the Board's power as essential to secure a system of air transportation in the public interest.[7] Specifically, we believe that where, as here, the Board concludes that the public interest requires two or more contiguous cities to be served as a single point, it should not be precluded from specifying the one airport which will best serve the entire area designated.[8] We think it is precisely to permit such prescribing of authorized service that the first sentence of § 401(f) empowers the Board to attach to certificates "such reasonable terms, conditions, and limitations as the public interest may require."[9]

Petitioners next assert that they were not given sufficient notice that the issue of service through Amon Carter Field was before the Board;[10] and that such lack of notice constituted a violation of the Administrative Procedure Act[11] and a denial of due process. Although the issue of service through Amon Carter was not specifically raised by Central's application or at the pre-hearing conference, we think that, nonetheless, within the principle enunciated and applied by the Supreme Court in Civil Aeronautics Board v. State Airlines,[12] adequate notice was provided. In that case, Piedmont Aviation, Inc., and State Airlines had applied for different new routes in a geographical area including all or a part of fourteen states in Southeastern United States. After consolidated hearings on the applications of State, Piedmont, and some twenty-three other applicants for routes in the same general area, the Board awarded Piedmont new routes not specifically sought in its application and more nearly approximating those sought by State.

---

4. 14 C.F.R. § 202.3 (1952).

5. See, e. g., Alaska Air Transportation Investigation, 3 C.A.B. 804 (1942); Middle Atlantic Area Case, 9 C.A.B. 131, 179–80 (1948).

6. 52 Stat. 978–79 (1938), 49 U.S.C.A. § 401(10), (20).

7. Cf. Civil Aeronautics Board v. State Airlines, 1950, 338 U.S. 572, 578, 580, 70 S. Ct. 379, 94 L.Ed. 353.

8. The Board has assumed that it possessed such power in a number of cases. See, e. g., Texas-Oklahoma Case, 7 C.A.B. 481, 539–40 (1946); Trans-Texas Certificate Renewal Case, 12 C.A.B. 606 (1951); Alaska Route Modification Case, Order E–7460, March 23, 1953; Indiana-Ohio Local Service Case, Order E–7184, February 20, 1953. Were the Board without such power in the present case, it would be possible for Central to choose to use Meacham Field at Fort Worth, thereby in effect vitiating the Board's order that service should be afforded to Dallas as well as Fort Worth.

9. 52 Stat. 988 (1938), 49 U.S.C.A. § 481(f).

10. Specifically, petitioners contend that no specific notice was given that the following issues would be determined: whether Central should be limited to serving Dallas through Amon Carter Field and denied the right to use Love Field; and whether operation to and from Amon Carter would constitute adequate service to Dallas.

11. 60 Stat. 239 (1946), 5 U.S.C.A. § 1004.

12. 1950, 338 U.S. 572, 578–81, 70 S.Ct. 379, 94 L.Ed. 353.

State attacked this order on the ground, *inter alia*, that since Piedmont had not applied for the particular routes certified, State had had insufficient notice that the Board might consider Piedmont as a competing applicant, and hence had had no fair opportunity to present evidence discrediting Piedmont's fitness to serve those routes.

The Supreme Court held that there was sufficient notice to State, even though Piedmont's application covered routes "differ markedly from those awarded".[13] In so holding, the Court approved the principle stated by the Board that in certification proceedings the prime consideration is the public interest in the establishment of a " 'sound transportation pattern,' " and not " 'how an individual proposal would benefit the applicant * * *.' " [14] Reasoning from this principle, the Court concluded that the requirements of notice are satisfied when interested parties are sufficiently informed of the issues so that they may present evidence which will enable the Board to reach its decision on the basis "of all available information." In finding that under this test State had received adequate notice, the Court noted: (1) State had sought certificates in the same general area, was a participant in the same proceedings, and had argued against Piedmont before the Board—in short,

it recognized Piedmont as a potential competitive applicant; and (2) the Board, in the exercise of its informed judgment, had denied State's petition for reopening of the proceedings in order to present evidence bearing on Piedmont's qualifications.

In the present case, petitioners likewise had notice of the certificate proceedings and participated therein. They knew, of course, that Amon Carter Field was under construction.[15] They should have been aware, from past experiences in Board proceedings, that Dallas-Fort Worth might be designated as a single point,[16] and that service to Dallas-Fort Worth through Amon Carter might be required by the certificate.[17] Moreover, at the hearing, itself, officials of Central were questioned at length as to the location of Amon Carter, its stage of completion, and Central's plans regarding service to it when completed. This obvious interest of the Board in Amon Carter, coupled with its known practice of prescribing service to points through particular airports, must be deemed to have sufficiently alerted petitioners to the possibility that service might be certificated to Dallas-Fort Worth through Amon Carter.

■ These circumstances, we think, preclude the view adopted by our dissenting brother that petitioners had a

---

13. 338 U.S. 572 at page 577, 70 S.Ct. 379 at page 382, 94 L.Ed. 353.

14. Southeastern States Case, 8 C.A.B. 716, 722 (1947), quoted, 338 U.S. 572 at page 580, 70 S.Ct. 379 at page 384. This principle may not, however, be read as in any way implying that even where the consequences to interested individuals of a Board's order are manifestly unjust, the Board's determination must be conclusive merely because couched in terms of "public interest." "Fair play," as well as "sound transportation," is a component of the public interest.

15. The City of Dallas sought unsuccessfully to block the construction of Amon Carter Field in proceedings before the Administrator of Civil Aeronautics. In the Matter of the Hearing of the Petition of the City of Dallas, Texas, Protesting

the Location of the North Texas Airport (1948). See City of Dallas v. Rentzel, 5 Cir., 1949, 172 F.2d 122.

16. Dallas-Fort Worth had been designated a single point in other proceedings before the Board: American Airlines, Inc.— Temporary Certificate of Public Convenience and Necessity, 3 C.A.B. 415, 419 (1942); Latin American Air Service Case, 6 C.A.B. 857, 921, 925 (1946); and Braniff Airways, Inc., Route No. 15 Restriction, 6 C.A.B. 515, 520 (1945).

17. Petitioners had previously participated in proceedings in which the Board had specified that points should be served through designated airports. See, e. g., Trans-Texas Certificate Renewal Case, 12 C.A.B. 606 (1951). See also note 8, supra.

right to expect that the designation of the airport would be the subject of a subsequent hearing pursuant to an "airport notice" filed by the carrier. The "airport notice" procedure [18] was not and could not have been relied on by petitioners. It applies only when the holder of a certificate desires to serve a point named in the certificate through an airport not then regularly used by the holder. Since it comes into play only on the filing of an "airport notice" by the holder, that procedure plainly is inapplicable where, as here, the Board has determined that service by the holder to a point named in the certificate should be through a particular airport.

■ Furthermore, as in State Airlines, the Board here considered petitioners' proffer of additional evidence when it denied their petition to reopen the proceedings and for reconsideration. Their petition stated that they were prepared to produce evidence (1) that service to Dallas through Amon Carter would not be adequate, and (2) that, if one airfield was to serve both cities, Love Field at Dallas, rather than Amon Carter, would minimize the cost to the public and would offer the more convenient service. The petition did not, however, indicate specifically the nature of the evidence to be submitted, although it was perhaps implied that data reflecting the greater volume of Dallas traffic would be offered. Since such data was already before the

Board, and since no other evidence was specified, we find that, as in State Airlines, supra, the Board was justified in declining to reopen the proceedings.[19]

■ In effect, petitioners' final objection—that the Board's order is not supported by substantial evidence—comes to this: that there is missing from the record the evidence they would have presented but for the alleged lack of notice that service to Dallas through Amon Carter was in issue.

Particularly, they say, there was insufficient evidence (1) to support the finding that Amon Carter Field would adequately serve Dallas; or (2) to enable the Board, in computing the amount of subsidy savings to the public, to appraise the adverse effects on Central's revenues which would result from the loss of Dallas traffic. But we think the evidence in the record clearly demonstrates that Amon Carter was sufficiently accessible to Dallas to serve its needs adequately, and, accordingly, that the loss of Dallas traffic would be inconsequential.[20]

Affirmed.

PRETTYMAN, Circuit Judge (dissenting).

I would remand this case for further hearing on the airport question. In one sentence the Board's order from which this appeal was taken specified the terminal point and designated the air-

---

18. 14 C.F.R. § 202.3 (1952).

19. The Board's supplemental opinion denying the petition for reconsideration makes clear that the Board had duly considered the objections raised by petitioners. The Board stated: "In reaching this decision we considered, among other matters, the fact that the subsidy cost to the Government would increase substantially if the new service * * * were provided through separate airports. * * * By the time of our decision, Central was providing service to Dallas and Fort Worth through three separate airports. The record also indicated that the facilities available at Amon Carter and its location and convenience were such as to provide adequately * * * for local service to both Dallas and Fort Worth."

20. Certain documents and materials were incorporated into the record by stipulation. Among such materials considered by the Board were: (1) data regarding runways, navigational aids, etc., available at Amon Carter Field and Love Field; (2) distances and ground transportation from Fort Worth and Dallas to Amon Carter Field and Love Field; and (3) lists of airports located fifteen or more miles from points served, together with ground transportation times and fares involved; and (4) estimated operating costs of Central from which could be deduced the added subsidy costs involved if Dallas and Fort Worth were to be served separately.

port to be used. I think sufficient notice that the airport question was to be decided in this proceeding was not given.

Central Airlines' application for a certificate was for a route "Between the terminal point Fort Worth, Texas, the intermediate points Dallas, Texas, Denton, Texas, * * *." It said nothing about the airport to be used. The report of the prehearing conference was to the same effect. This was the extent of the notice given as to the nature and scope of the hearing to be held.

No specific notice was given that the Board might designate Dallas-Fort Worth as the terminal point. Nevertheless, under the doctrine of the State Airlines case,[1] we are compelled to conclude that Dallas and all other parties had ample notice that, instead of specifying Fort Worth as the terminal point and Dallas as an intermediate point, the Board might combine the two and designate Dallas-Fort Worth as the terminal point.

But the question of what airport should be used to serve the designated terminal point was a different question. In its brief the Board tells us:

"Under the terms of each carrier's certificate in effect since the beginning of the administration of the Civil Aeronautics Act, a carrier after being authorized to serve a new point is required to file with the Board an 'airport notice' notifying the Board of the airport selected by it to serve the new point. Under the Board's practice the carrier is permitted to use that airport if (a) the airport is suitable for the purpose when compared with other available airports in the vicinity, and (b) the airport does in fact serve the designated point."

The designation of "Dallas-Fort Worth" as a terminal was, as the Board phrased it in the Supplemental Opinion dated September 24, 1953, "a designation of service to Dallas and Fort Worth as a single rather than separate points." If this was authorization of service to "a new point", the above quotation from the Board's brief applies directly and specifically. If it was not designation of a new point, but was merely service by a new airport to two points already served, the Airport Regulations[2] apply specifically. Those Regulations apply in terms to cases where a carrier desires to serve a point already named in the certificate but "through the use of any airport not then regularly used by such holder," i. e., carrier. Central was serving Dallas and Fort Worth but at Love and Meacham Fields; Amon Carter Field was an airport not then regularly used. In either event, whether "Dallas-Fort Worth" is a new point or is merely the two old points served by an airport not heretofore regularly used, the designation of the airport is a separate proceeding from the grant of the certificate. Thus, according to the Board's statement and its Regulations, the choice of airports is a problem to be considered in "airport notice" proceedings, separately from other issues in a certification proceeding. Of course, if the notice in the certification proceeding had contained notice of the airport issue, I suppose the two questions could have been combined in a single proceeding. But that was not done in this case.

It seems to me that Dallas had a right to rely upon the established procedure in respect to the designation of the airport to be used. It had a right to expect, in the absence of any notice to the contrary, that, after the terminal points and other issues in the certification proceeding had been concluded, the selection of airports would be another step to be taken pursuant to an "airport notice". Dallas had no semblance of a notice that, contrary to the established procedure, the selection of the airport would be dealt with in the same order which specified

1. Civil Aeronautics Board v. State Airlines, 1950, 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353.

2. 14 Code Fed.Regs. § 202.3.

**508**

the terminal points. It seems to me that Dallas was entitled to that notice.

In its petition for reconsideration Dallas offered to present evidence "showing first, that service of Dallas through Fort Worth International Airport (Amon Carter Field) is not and in the circumstances will not be adequate service required by Section 404 of the Act, and second, that if under the peculiar circumstances of any case both Dallas and Fort Worth are to be served through a single airfield, the public interest requires that Love Field should be the field used for that purpose in view of the much greater volume of available traffic to and from Dallas than to and from Fort Worth." In its memorandum denying reconsideration the Board did not treat of this proffer of evidence but merely referred to facts which it said were indicated in the record.

I would remand the case for further hearing upon the airport question and for a redetermination of that question pursuant to the established procedure and regulations relating thereto.

Miller, Clark and Fahy, JJ., dissented in part.