## UNITED AIR LINES, Inc. v. CIVIL AERONAUTICS BOARD.

### Nos. 10544, 10567.

United States Court of Appeals
Seventh Circuit.

July 8, 1952.

---

5. State v. Fouquette, Nev., 221 P.2d 404.

102

John T. Lorch, Floyd M. Rett, Henry L. Hill, H. Templeton Brown, Chicago, Ill., James Francis Reilly, Washington, D. C., for petitioner, Mayer, Meyer, Austrian & Platt, Chicago, Ill., of counsel.

J. Roger Wollenberg, Sp. Asst. to Atty. Gen., Emory T. Nunneley, Jr., John H. Wanner, Associate Gen. Counsel, Civil Aeronautics Board, Washington, D. C., H. G. Morison, Asst. Atty. Gen., James L. Highsaw, Jr., Washington, D. C., Chief, Litigation and Research Division, Civil Aeronautics Board, for respondent.

Harry A. Bowen, Washington, D. C., Emil N. Levin, Chicago, Ill., Charles P. McHarry, Gordon Campbell, Louis Fischer, Monterey, Cal., George R. Hooper, Chicago, Ill., C. Edward Leasure, Herman F. Scheurer, Jr., Washington, D. C., Elmer M. Leesman, Chicago, Ill., for Frontier Airlines, Inc., intervenor, Friedlund, Levin & Friedlund, Chicago, Ill., of counsel.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

Petitioner United Air Lines, Inc. (hereinafter called United) asks us to review and reverse orders entered in two proceedings before the Civil Aeronautics Board (hereinafter called Board). No. 10544 was designated before the Board as the Frontier Renewal Case, and No. 10567 as the Southwest Renewal-United Suspension Case.

United operates an air line system over 18,704 certificated route miles. Its routes extend from New York to Hawaii, and its transcontinental system extends from New York and other eastern cities to various West Coast cities. It also operates local service between various intermediate points.

Rock Springs, Wyoming, is a city of 10,-567 population, and has been a certificated point on United's Route No. 1. United originally was authorized to serve Rock Springs under a certificate issued pursuant to the Board's order of May 22, 1939, in accordance with the "grandfather" provisions of Sec. 401(e)(1), Civil Aeronautics Act, 49 U.S.C.A. § 481 (hereinafter called the Act).

Frontier Air Lines, Inc. (hereinafter called Frontier) serves Rock Springs as a point on a local air service route serving small cities in the Rocky Mountain area. Authorization to serve Rock Springs on this route pursuant to a temporary certificate of public convenience and necessity was originally granted for a three year period to Summit Air Ways, Inc., a predecessor of Frontier. This authority granted to Frontier was predicated largely upon find-

ings as to the lack of adequate transportation facilities in a specified area because of the mountainous terrain, and the economic characteristics of the area.

In a consolidated proceeding, the Board directed Frontier to show cause why its temporary certificates of public convenience and necessity for Routes Nos. 73 and 74 should not be extended three years from March 31, 1950. The Board directed United to show cause why its authority to serve Rock Springs and Cheyenne, Wyoming, should not be suspended until March 31, 1953. Public hearings were held before an examiner who issued his report recommending that Frontier's certificate be renewed for a period of three years from March 31, 1950, including the authority to serve Rock Springs and Cheyenne, and that United's authority to serve Rock Springs be suspended until March 31, 1953. However, the examiner did not recommend a suspension of United's authority to serve Cheyenne. The rugged terrain of the Rocky Mountain area in many places imposes serious obstacles to surface transportation. The examiner's report emphasized the need for local air service for the area involved because of geographical characteristics. He found also that both United and Frontier would benefit financially by the suspension of service to and from Rock Springs by United. The examiner further found that the suspension of service by United at Rock Springs would inconvenience only a small part of the passengers to and from that point, and concluded that the public convenience and necessity required the suspension of United's service at Rock Springs until March 31, 1953. The Board substantially adopted the examiner's findings and conclusions and entered its opinions and orders on September 14, 1951, and November 9, 1951. The Board found Monarch Air Lines and Challenger Air Lines [1] had operated in a region where geographical conditions impeded efficient surface transportation between communities of substantial size, and that there was a public need in that area for air service, and that Monarch and Challenger had made steady improvement in furnishing such service. The Board also approved the examiner's finding that an uneconomic duplication of air service by United and Frontier existed at Rock Springs. In No. 10544 petitioner seeks a review of said orders in so far as they suspend the authority of United to serve Rock Springs, Wyoming, for the period beginning January 12, 1952, to and including March 31, 1953.

In the Southwest case two orders were consolidated by the Board, one directing United to show cause why its authority to serve Santa Barbara, Monterey, Red Bluff and Eureka, California, should not be suspended and the other instituting an investigation to determine whether service by Southwest Airways Company (hereinafter called Southwest) should be substituted for service by United at Salinas, California, and Klamath Falls, Oregon.

United serves Monterey and Santa Barbara on its Route No. 1 between Seattle, Washington, and San Diego, California, pursuant to a certificate originally granted on May 22, 1939, in accordance with the "grandfather" provisions of the Act. Southwest was certified to provide local air service to Eureka, Monterey, Santa Barbara, and Red Bluff.

United's service and authorizations antedated those of Frontier and Southwest at all cities in question in both proceedings except Eureka, where the authorizations for United and for Southwest were of the same date. United inaugurated service at Rock Springs, Santa Barbara and Monterey in July, 1927, October, 1936, and August, 1938, respectively, and its service at Red Bluffs and Eureka was instituted in August, 1940, and December, 1946, respectively. The temporary certificates issued to Frontier and Southwest were issued pursuant to Sec. 401(d)(2) of the Act.

In the Southwest case, after hearings had been held and a report filed by an examiner, the Board made detailed findings upon the issue of suspending United's service, and concluded that the public convenience and

1. These two air lines were consolidated and the company name became Frontier Air Lines, Inc.

necessity required the suspension of service of United at Santa Barbara, Monterey, Red Bluff and Eureka, California, until September 30, 1954, but that service by Southwest should not be substituted for service by United at Salinas and Klamath Falls.

In the Southwest case the Board found that in the area north of San Francisco transportation was slow and many times circuitous, and that local service would offer an appreciable improvement in transportation facilities. The Board concluded public convenience and necessity required a local air service route for a period of three years along the Coast, serving among other points Eureka, and also an inland route serving among other points Red Bluff.

As to the general policy of extending the certificates of local air service carriers, the Board emphasized (1) the substantial contribution made by local air service carriers to the development of an air transportation system meeting the needs of commerce and the postal service, (2) the considerable national defense value of the operations of such carriers, and (3) the economic problems faced by such carriers in achieving self-sufficiency. The Board stated, "From the information now before the Board we are of the general opinion that feeder service should seldom if ever be competitive. The traffic potential is so limited in most feeder territory that duplicate operations by two or more carriers can seldom if ever be economical. We have reached the conclusion that in general where a feeder carrier's route is duplicated by a trunkline carrier and such route is not necessary to the trunkline carrier's operation, then such route should be served by the feeder carrier alone. Conversely, where a route is a necessary and integral part of a trunkline carrier's system and essential to its economical operation, then such route should not be served by a feeder carrier."

The Board also declared, "In reaching our final conclusion to suspend, we wish to emphasize the temporary nature of our action. It is our desire, herein, to conduct an experiment to determine and compare the results of non-competitive service by a local service air carrier with those which obtained when competition between such air carrier and a trunkline was in force at the same points. If in fact substantial savings can be realized by the Government we may be impelled to take similar action at other points in the air transportation system. If Southwest in fact becomes self-sufficient in 1954 there may no longer be any need for the suspensions ordered herein. Even if Southwest does not achieve financial independence but no net savings derive from the experiment, United may be restored. In any event our action herein should be considered in its true light as a temporary step in an effort to experiment with techniques of reducing Federal subsidy in transportation."

The Board's opinion and order (Serial No. E–6063) to effectuate suspension of service by United at Santa Barbara, Monterey, Red Bluff and Eureka were dated January 29, 1952, and in No. 10567 petitioner seeks a review of the order in so far as it suspends United's authority to serve these four California cities.

Petitioner claims that in making the orders here in dispute the Board was attempting to exercise unauthorized power and authority "for the realignment of domestic air lines pattern"; that Congress did not grant to the Board the power of compulsory route realignment; and that the Board is attempting such a realignment under the guise of its power of suspension. Petitioner also argues that its certificates of public convenience and necessity are its property, and that the Board's orders violate the Fifth Amendment of the United States Constitution prohibiting the taking of private property without due process and without compensation. Petitioner also claims the Board's orders are not supported by adequate or sufficient findings.

Sec. 401(h) of the Act provides, "The Board, upon petition or complaint or upon its own initiative, after notice and hearing, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require,

or may revoke any such certificate, in whole or in part, for intentional failure to comply with any provision of this title or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate: Provided, That no such certificate shall be revoked unless the holder thereof fails to comply, within a reasonable time to be fixed by the Board, with an order of the Board commanding obedience to the provision, or to the order (other than an order issued in accordance with this proviso), rule, regulation, term, condition, or limitation found by the Board to have been violated. Any interested person may file with the Board a protest or memorandum in support of or in opposition to the alteration, amendment, modification, suspension, or revocation of a certificate." Under this section of the statute two separate areas are defined wherein the Board has authority to act with reference to existing certificates. One area involves revocation of certificates for violations of the Act or Board regulations or orders, and the other involves alterations, amendments, modifications or suspensions of existing certificates, in whole or in part, where the public convenience and necessity so require. It will be noted that the power given to the Board to alter, amend, modify or suspend existing certificates is not punitive in character, but depends for its exercise upon the requirements of public convenience and necessity, which are the same

standards under which the Board may grant certificate rights under Sec. 401(d) of the Act.

The Civil Aeronautics Act was enacted at a critical stage in the air transport industry, struggling to survive in the face of excessive competition and a number of other adverse factors. The Act was designed to bring out of chaos a system of regulated competition and the encouragement and promotion of civil aviation, not only in the interests of commerce but also in the interests of national defense. Provision was made for the Board to determine the amount of mail pay subsidy needed by a carrier to carry out its part of the program. The Board was set up as the agent of Congress to administer this program of regulation, promotion and subsidies. For many years United and other trunklines have been heavily subsidized by the federal government.

█ The statute permits the Board to suspend a certificate theretofore issued where the public convenience and necessity so require, but the determination of the meaning of the standards of public convenience and necessity is not left to the whim of the Board. That standard appears in nearly all public utility statutes, and, in addition, Sec. 2 of the Act provides that the Board shall consider a number of things as in accordance with public convenience and necessity.[2]

2. Sec. 2 of the Act, 49 U.S.C.A. § 402, reads:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the

relations between, and coordinate transporation by air carriers;

"(c) The promotion of adequate, economical and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The regulation of air commerce in such manner as to best promote its development and safety; and

"(f) The encouragement and development of civil aeronautics."

106

It seems unreasonable that Congress intended to give the Board power to grant certificate rights, but to deny it any authority to modify them to meet the changing demands of commerce and the national defense. The need for some flexibility in an industry characterized by continual and rapid changes is apparent. In Sec. 401(h) of the Act, Congress gave the Board authority to "alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require."

The terms, "alter," "amend," and "modify" do connote some limitation. In the larger aspect any changes ordered under the Board's authority to alter, amend, and modify must be partial and not total. Further, the Board cannot be permitted to do piece-meal or step-by-step that which it has not power to accomplish in one proceeding. However, the authority of the Board to alter, amend, or modify contemplates the power to make permanent though limited changes in existing certificates. The Board has recognized this limitation by holding that an alteration ordered pursuant to the authority of this section must not be such as to transform the essential character of the carrier's operation. Panagra Terminal Investigation, 4 C.A.B. 670.

The power to suspend depends upon the same factors of public convenience and necessity as does the power to alter, amend or modify. It contemplates the continued existence of the certificate right, and the possibility that the public convenience and necessity factors giving rise to the suspension may change or come to an end. The Board had the choice to proceed under its authority to suspend, and exercised it in preference to acting under its power to alter, amend or modify.

In our judgment the Board had the authority to suspend the certificates of United to serve the five cities hereinbefore described for a definite temporary period, provided the public convenience and necessity so required. The suspension orders here in question are to be effective for a definite limited time—to March 31, 1953, in the Frontier case and to September 30, 1954, in the Southwest case.

United insists that in fact the suspensions are not temporary, but are part of a broad plan by the Board to realign substantial segments of the air routes of the nation. Thus United questions the good faith of the Board which emphasized the temporary nature of its action. In any event United is protected by the right to a full administrative hearing before an extension of the present temporary suspensions may be ordered, and has the right of court review of any Board order entered after such hearing.

In the case of Western Air Lines, Inc., v. Civil Aeronautics Board, 9 Cir., 196 F. 2d 933, 936, the Board had suspended Western's service to El Centro, California, and Yuma, Arizona, and had granted to Bonanza Airlines, a local type carrier, a route extension to provide service to those cities. Western claimed its suspension was in fact permanent and in substance a revocation, pointing out that the history of feeder air lines like Bonanza shows they are permanent. The suspension was effective to December 19, 1952. The court held that it was "merest speculation" to say that the suspension order was in substance a permanent revocation. The court said, "The Board may classify between types of air service and may find that one kind of air service is not appropriate during a certain time. To say that the Board could not substitute during that time another type of air service, required as a public necessity, would be an unreasonable limitation upon the Board's power to plot the air map, primarily in the public interest." The court affirmed the suspension order of the Board.

Our next inquiry must be whether the suspensions ordered were required by the public convenience and necessity. The Supreme Court has admonished us that in court reviews of such administrative orders as are now before us the public interest looms large. Scripps-Howard Radio, Inc., v. Federal Communications Commission, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229. Also, the doctrine has been developed that those seeking court review under provisions like Sec. 1006 of the Act, 49 U.S.C.A. § 646, are primarily vindicating the public and not a private interest.

Scripps-Howard Radio, Inc., v. Federal Communications Commission, supra, 316 U.S. at page 14, 62 S.Ct. 875. In Civil Aeronautics Board v. State Airlines, Inc., 338 U.S. 572, at page 578, 70 S.Ct. 379 at page 383, 94 L.Ed. 353, the court said: "The Board's major standard is the public interest in having convenient routes served by fit and able carriers," and, 338 U.S. at page 580, 70 S.Ct. at page 384: "We think the standard adopted by the Board under which the public interest is given a paramount consideration is a correct standard."

It is also clear that the purpose of the Act is not primarily to advance the private interests of carriers, but the public interest in an adequate air transport system. When conflicts between private and public interests occur, the private interests of the certificate holder should yield to the broader interests of the public embodied in the concept of the public convenience and necessity. United's position amounts to this—that a route structure once established cannot be changed, absent statutory causes for revocation, without the consent of the carrier, no matter how urgent the public need may be for such a change. We do not think such a narrow construction of the Board's powers is warranted.

Keeping in mind the parmount consideration to be given to the public interest, as well as the provisions of Sec. 2 of the Act hereinbefore set forth, it is clear that the Board did not exceed its powers in ordering a temporary suspension of service by United at Rock Springs. The evidence supports the Board's finding that the traffic available at Rock Springs is insufficient to support service by both United and Frontier. Instead of a monetary loss resulting from the suspension, United will have an operational gain of $8,665 annually according to its figures, or $31,496 annually according to the Board's calculations. In fact United suggested it would consent to a suspension of service at Rock Springs provided Frontier would purchase United's facilities and assume United's lease obligations and moving costs. However, the Board did not give its approval to this proposal.

Furthermore, the Board did not display prejudice against United as a trunkline carrier, for it determined that public convenience and necessity required the elimination of Frontier's service at a number of points including Colorado Springs which is also served by two trunkline carriers.

United's suspension and certification, instead, of service by Frontier alone at Rock Springs not only contributes to the development of an air transport system adequate to the nation's commerce and defense (Sec. 2(a) of the Act), but improves sound economic conditions in the operation of both carriers (Sec. 2(b) of the Act), and aids in the promotion of economic and efficient service by both carriers (Sec. 2(c) of the Act). The Board thus accomplished the basic purposes of public convenience and necessity as spelled out in the Act.

While many of these same considerations apply equally to the Southwest case, the financial picture is somewhat different, in that the suspension of United's service at the four California cities will result in a monetary loss to United of $150,000 annually. However, southwest will gain approximately $200,000 annually and this will enable the government to reduce Southwest's subsidy requirements by that amount. The Board found that although Southwest had made encouraging strides toward self-sufficiency, it could not achieve that goal in the immediate future, and further that Southwest's progress was impeded with the uneconomical competition with United at the four California cities.

The Board pointed out that United's net income before taxes was nearly $19,500,000 and concluded that the loss of $150,000, while substantial, was not sufficient to outweigh the considerations favorable to the suspensions. In applying the standard of public convenience and necessity the Board necessarily balanced various elements, such as the needs of the area for a local type air service, the cost to the government to support carriers to take care of such needs, and the probability of the reduction of that cost made possible by the suspensions,

against the elements of the financial injury to United and some inconvenience to passengers. The Board weighed, and made its evaluation of, all these elements; and we cannot say that in ordering a temporary suspension of service by United at the four California cities it exceeded its authority.

United insists that the Board previously determined that public convenience and necessity required service by it at these four cities, and that traffic has increased since said dates, and, as it was first in serving said cities, the Board now has no authority to alter or suspend its certificates. But the fact that administrative judgment as to public convenience and necessity has once been made does not mean that the certificated routes are by law perpetually frozen and impervious to any change whatsoever. The Act in no way indicates that Congress intended that an air route once established could not be altered or modified in a limited degree to meet changing needs of commerce and the national defense.

■■■■■ We agree that the power of the Board to "suspend" does not include the power to "revoke." Had Congress intended to grant the power to revoke, other than as set forth in Sec. 401(h) for the violation of orders and regulations, it could have said so exactly as it did in Sec. 402(a) in referring to foreign air carrier permits. But the Board here acted under its power to suspend and it specifically pointed out the temporary nature of its orders. United's suspicions and convictions to the contrary, we cannot say at this time, on the record before us, that the orders issued by the Board, and designated by it as temporary, are in fact permanent revocations or realignments.

■■■■■ The remaining contention of United is that its certificates of convenience and necessity are property, and that the Board's orders in effect transfer its property to Frontier and Southwest without compensation, in violation of the Fifth Amendment to the United States Constitution.

Sec. 401(j) of the Act, 49 U.S.C.A. § 481 (j), provides, "No certificate shall confer any proprietary, property, or exclusive right in the use of any air space, civil airway, landing area, or air-navigation facility." Furthermore it seems clear that United and all other holders of certificates of public convenience and necessity acquire whatever rights they may possess subject to the Board's power to alter, amend, modify or suspend the certificates.

Some light is thrown upon the nature of claimed property rights in certificates of convenience and necessity by the opinion of the Supreme Court in United States v. Rock Island Motor Transit Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391. There the certificates had been issued by the Interstate Commerce Commission under the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., and the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., pursuant to "grandfather" provisions of said Acts. The Commission ordered modification of the certificates prohibiting in several respects the transit company's operations as they had been previously carried on. The transit company was a wholly owned affiliate of the Rock Island Railroad, and the Commission had decided that motor operations of railroads and their affiliates must be auxiliary to and supplemental of train service. The orders entered were to carry out that policy.

The district court held that the certificates were in the nature of franchise rights, and that the rights which they conferred were property of value, and held that the Commission's order violated the Fifth Amendment. 90 F.Supp. 516, 522. The Supreme Court reversed, holding among other things that the Commission's modification of the transit company's certificate of convenience and necessity was not depriving it of property without due process of law.

In the case at bar we hold that the Board's action in suspending United's service at the points involved was not a taking of United's property without due process of law, in violation of the Fifth Amendment.

Although we have discussed the power of the Board to alter, amend, and modify, we wish to emphasize that we do not intend

to indicate the limitations or the extent of the Board's authority under those provisions. It was necessary to discuss them somewhat because the power of the Board to suspend appeared in the same sentence of the statute. The only matter before us for decision is whether the Board exceeded its authority in entering the orders to temporarily suspend United's operation at the several cities. We hold that the Board did not exceed its authority and therefore the orders of the Board in each of the proceedings heretofore described will be affirmed.