**NORTH AMERICAN AIRLINES, Inc., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**American Airlines, Inc., Intervenor.**

**No. 12041.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 4, 1954.

Decided June 23, 1955.

---

Mr. Hardy K. Maclay, Washington, D. C., with whom Mr. Walter D. Hansen, Washington, D. C., was on the brief, for petitioner.

Mr. Gerald F. Krassa, Attorney, Civil Aeronautics Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Messrs. Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, John H. Wanner, Associate General Counsel, Civil Aeronautics Board, and James L. Highsaw, Jr., Chief, Litigation and Research Division, Civil Aeronautics Board, were on the brief, for respondent. Messrs. O. D. Ozment,

Attorney, Civil Aeronautics Board, and Charles H. Weston, Attorney, Department of Justice, also entered appearances for respondent.

Mr. Howard C. Westwood, Washington, D. C., with whom Messrs. John W. Douglas, New York City, and Jerome Ackerman, Washington, D. C., were on the brief, for intervenor.

Before PRETTYMAN, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Petitioner asks review of a Board order which denied petitioner's application for authority to engage in air transportation under the name North American Airlines, Inc., and which further ordered the petitioner, "its successors, assignees, representatives, agents, officers and employees . . . to cease and desist from engaging in air transportation under the names North American Airlines, Inc., North American Airlines, North American, or any combination of the word 'American.' "

Petitioner, holder of Letter of Registration No. 528 issued to Twentieth Century Airlines, Inc., July 22, 1947, is an irregular air carrier engaged in air transportation primarily between New York, Chicago, Kansas City and Los Angeles. About May 21, 1951, petitioner commenced operations under the trade names of North American Airlines and North American, and on March 3, 1952, petitioner changed its corporate name to North American Airlines, Inc. By letter dated March 11, 1952, petitioner advised the Board of its change of name and sought reissue of its Letter of Registration accordingly. Without then acting upon petitioner's application, the Board on August 19, 1952, amended its regulations to provide that on and after November 15, 1952, an irregular carrier might hold out to the public and perform air transportation services only in the name appearing in its Letter of Registration.

The Board's introductory comment to its new Economic Regulations, § 291.28 pointed out that where good will had been established in a name by use thereof, the Board would deny permission to continue such name only in cases where it believed that a violation of § 411 of the Act [1] might be involved and where such fact had been established after notice and opportunity for a hearing. On October 6, 1952, petitioner, pursuant to the new regulation, applied to the Board for authorization to conduct its operations under its corporate name rather than as Twentieth Century Airlines, Inc. In support of its application, petitioner set out that it had invested "substantial" sums of money in the name North American Airlines and had established "substantial" good will in that name at a time when there was no Board regulation of the names of air carriers.

American Airlines, Inc., was allowed to intervene in opposition to petitioner's application, representing, principally, that the name "North American" infringed upon the established name of American and constituted unfair competition within the meaning of § 411 of the Act, and further urging that North American had no vested right or established good will in the name "North American" which the Board was bound to recognize. Thereupon the Board ordered an investigation to determine whether petitioner's engaging in air transportation under the names North American Airlines, Inc., North American Airlines, or North American was in violation of § 411 and, if so, whether the Board should issue a cease and desist order accordingly, and this investigation

1. 49 U.S.C.A. § 491, which reads in part as follows:

"The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof."

was consolidated for hearing and decision with North American's application.

## I

The Board found (1) that American Airlines and North American Airlines are in competition in air transportation; (2) that American Airlines was incorporated, *eo nomine,* and that the term "American" had acquired a secondary meaning before North American adopted the trade name of, and changed its corporate name to, North American Airlines; (3) that the substantial public confusion found herein was likely to continue; (4) that use of the name "North American Airlines, Inc.," "North American Airlines," "North American" or any combination of the word "American" constitutes an unfair or deceptive practice and an unfair method of competition within the meaning of § 411 of the Act; (5) that the public interest required denial of the application for authority to engage in air transportation under the name North American Airlines, Inc.; and (6) that petitioner and its successors, assignees, representatives, agents, officers and employees should be ordered to cease and desist from engaging in air transportation under the names listed in (4), above.

Thereupon, the Board, one member dissenting, entered its order, drastic, as it knew,[2] and unprecedented, so far as we have been shown. It purported to predicate public interest upon the "confusion,"[3] attributable to North American's "knowing" use of a "confusingly similar name" to that of American. Its brief tells us that there were "six groups of confused members of the public, namely: (1) ticket holding passengers, (2) persons meeting passengers, (3) persons making inquiry regarding transportation, (4) persons having business with petitioner [North American], (5) the Post Office, and (6) the public press." Our examination of the record and the exhibits discloses, (1) some North American passengers with North American tickets in their hands presented themselves at American ticket counters; (2) some people intending to meet North American passengers called American Airlines "information" or ticket counters to ask about the arrival of North American flights; (3) some people who heard North American radio advertising of deferred payment flight plans called American Airlines for particulars as to how North American's "fly now—pay later" program operated; American offered no such plan; (4) "persons having

2. "We are well aware that an order requiring respondent to cease and desist using the name under which it has been engaging in air transportation is a serious sanction which necessarily involves disturbance and loss to the carrier. We do not impose such a measure lightly. But the record is convincing that the public interest requires this action in order to prevent further public confusion between respondent and intervenor due to similarity of names. The maintenance of high standards in dealing with the public is expected of common carriers, and the public has a right to be free of the inconveniences which flow from confusion between carriers engaging in the transportation of persons by air. The speed of air travel may well be diminished when passengers check in for flights with the wrong carrier, or attempt to retrieve baggage from the wrong carrier, or attempt to purchase transportation from the wrong carrier, or direct their inquiries to the wrong carrier. Friends, relatives or business associates planning to meet passengers or seeking information on delayed arrivals are subject to annoyance or worse when confused as to the carrier involved. The proper handling of complaints from members of the public is impeded by confusion as to the carrier to whom the complaint should be presented. The transportation itself may differ from what the confused purchaser has anticipated (e. g., in terms of equipment), even though the time and place of arrival may be about the same. It is obvious that public confusion between air carriers operating between the same cities is adverse to the public interest, and we have determined that the public should be protected from the effects of the confusion shown on the record by eliminating what we find to be the cause of such confusion."

3. See note 2, supra.

business" were (a) a painter's union official who telephoned to American to protest that a sign was being painted by non-union painters but was assured this was a North American sign; (b) a hotel in Kansas City where North American had "hotelled" its passengers sent its bill to American; (c) a radio repair service telephoned to American about a North American bill for $13; (d) a tailor who addressed a North American tailoring charge for $18 to American although the street number was that of North American; (5) the Post Office misdelivered to American (a) one correctly addressed envelope intended for North American; (b) the tailor bill mentioned in (4) (d) above; (c) in Burbank where both lines had ticket counters at the terminal, a witness said some 6 to 12 envelopes came to the American counter but were intended for the North American counter; (6) a robbery of a North American ticket office was described in the newspapers as having occurred at American's office.

The Board offered no evidence whatever. We have already noted the nature and the gist of such evidence as was offered which was supplied by employees of the intervenor, American, and upon such the Board rested its finding of "confusion." Board Member Adams in his dissent commented:

> "Since American Airlines, Inc., carries approximately 5½ million passengers each year over its system, I am not impressed with the fact that witnesses in this case (principally those employed by American Airlines itself) have testified that some confusion has existed. . . . On the contrary, I would be greatly surprised, (in view of the several million phone calls and other communications which American Airlines receives every year over and above those received from passengers which it actually

carries) if there were not *some* demonstrable public confusion . . .."

The Board also concluded that the word "American," as used by the intervenor, had acquired a secondary meaning, that intervenor had long engaged in extensive advertising of its services under that name, and that this "practice has helped to instill in the minds of the public the notion that the word 'American' when used in connection with domestic air transportation denotes American Airlines." In this particular it did not "overlook" "the recent use of the word American in the name of the sectional local service carrier All American Airways," the "recent use of the word American in the name of the irregular carrier Air America," and the international "use of American in the name Pan American World Airways." In this connection it should be noted that American Airlines, Inc., since 1934, and its predecessor American Airways, Inc., since 1930, had continuously been engaged in air transportation. In 1949 American Airlines, Inc., registered in the Patent Office as a service mark the two words in combination, "American Airlines." [4]

No ticket agents were parties to the proceeding, nor was there evidence as to their engaging in proscribed practices within the meaning of the Act, but they as a class, throughout the nation, have been brought within the sweep of the Board's order.

The Board rejected, and decided it "need not comment" upon, its Examiner's finding:

> "There is no evidence of record that North American adopted its name with intent to deceive the public or trade upon the good-will and business reputation of American, or that American has been injured by such operation . . .."

Our examination of the record demonstrates that the Examiner was correct.

---

4. Even were we to assume that such registration is here significant, the likelihood of consumer-confusion is still the test of secondary meaning. Charles D. Briddell, Inc., v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 421.

Nor is there evidence that North American palmed itself off as American; that North American "confused" American's passengers to the former's advantage; that North American's advertising was intended to or did entice American's passengers to fly North American, indeed it is difficult to assume that North American's advertising could be of the slightest advantage unless it could bring passengers to North American, rather than American. Nor is there evidence that North American flew a single passenger who paid its lower rate in the thought that he contracted for anything but North American's non-scheduled transportation, or that American was harmed otherwise than by the competition afforded by any irregular carrier. In short, the public may have benefited, so far as the record shows, and in any event, there is no demonstration that North American affirmatively acted in violation of a statute within the jurisdiction of the Board.

Except as just noted, the Board adopted, almost *in toto*, the findings of the Examiner, and we quote once more:

"There is no question but what American has acquired during the past 20 years through its constant efforts a good-will in its use of the name 'American' or 'American Airlines,' which has become a valuable asset to be protected. However, an action for infringement of American's trade name can find its remedy in the courts. Section 411 was not designed for the purpose of protecting the private rights of an individual carrier except to the extent

of regulating competition between the various air carriers to assure fair competition and thereby maintain a sound economic transportation system; also, equally important, the Board was given the responsibility of safeguarding the public interest against unfair and deceptive methods of competition."

The Examiner came almost to the heart of the problem; his error, like that of the Board, stems from the application of criteria which fell short of the public interest findings demanded by the law.

## II

■ "The Civil Aeronautics Act was enacted at a critical stage in the air transport industry, struggling to survive in the face of excessive competition and a number of other adverse factors. The Act was designed to bring out of chaos a system of regulated competition and the encouragement and promotion of civil aviation, not only in the interests of commerce but also in the interests of national defense." United Air Lines v. Civil Aeronautics Board, 7 Cir., 1952, 198 F.2d 100, 105. "It is also clear that the purpose of the Act is not primarily to advance the private interests of carriers, but the public interest in an adequate air transport system." Id. at page 107. And see Civil Aeronautics Board v. State Airlines, 1950, 338 U.S. 572, 578, 70 S.Ct. 379, 94 L.Ed. 353.[5]

The Act was the culmination of years of groping. By 1937 it became clear that Congress was determined to formulate an over-all policy for the regulation of air transportation. Senator Harry S.

---

5. Section 2 of the Act, 49 U.S.C.A. § 402, in pertinent part reads:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest . . .

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the . . . domestic commerce of the United States. . . .

\* \* \* \* \*

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the . . . domestic commerce of the United States . . ."

Truman as chairman of a subcommittee of the Senate Committee on Interstate Commerce opened hearings on S. 2 and S. 1760. Representatives of the Air Line Pilots Association denounced the practices of an air line which had been "cheating the pilots out of some measure of the pay which was rightly theirs by means of juggling the seniority of their pilots" and of another air line which "was deliberately flying its pilots far in excess of the maximum flying hours permitted . . .." By such means, it was charged, some bidders for air mail contracts were gaining advantages over others. The Solicitor of the Post Office Department testified that in the past many of the mail contracts had been held or controlled by holding companies and banking interests. Some air lines, he said, had been affiliated with manufacturers from whom they were required to purchase their equipment and to pay prices fixed by the manufacturing companies. There had been interlocking boards of directors, and many if not most of the lines had been dominated by other than practical air line operators. At one time three holding companies had controlled 92 per cent of the air mail contracts then in existence. Some air mail contractors had invaded the territory of others with competitive "off-line" service. When two competitors had submitted bids for the same mail contract the company awarded the contract was bought out by its competitor. Without more than these few cursory references to various situations described to the Senate committee, enough has been said to suggest that sharp conflict and acrimonious exchanges alerted the Congress to the need for action. The spokesman for the leading air lines testified, in part,

that ". . . contrary to the condition in any other form of transportation, the Government of the United States is, and for a long time will be, the largest single customer of the air carriers, and in particular cases, among the smaller lines, this patronage on the part of the Government may exceed the total patronage of all other customers." [6]

One cannot study the testimony at the hearings without an abiding feeling that the "public interest" concept engrossed or even dominated all concerned. Large outlays of public funds were to be required to aid in promoting the healthy growth of the air transportation industry. Special provisions were written into the legislation to deal with specific and demonstrated past abuses.[7] Encouragement of competition had a definite place in the declaration of policy, just as the Board "in the interest of the public," not in furtherance of the private interests of one entity as against another, was empowered to deal with unfair practices or unfair methods of competition.

Undoubtedly the draftsmen realized that many situations would arise which could not with particularity be spelled out in the proposed counterpart of § 411.[8] It considered the advice of Commissioner Eastman.[9] "Now, these two bills you have before you follow the usual pattern of regulatory bills. And you will find that much of the language is similar to language which is now already in the law with reference to railroads or with reference to motor carriers. *That, I think, is a desirable thing, because when language has been interpreted once it is desirable to have it used again, thus avoiding many questions always arising with respect to the employment*

---

6. Hearings before United States Senate Subcommittee of the Committee on Interstate Commerce on S. 2 and S. 1760, 75th Cong., 1st Sess. 454 (1937).

7. See, generally, for the business regulative features, §§ 408–416 of the Act, 49 U.S.C.A. §§ 488–496. As additional background, see Two Decades—Federal Aero-Regulation in Perspective, 12 Journal of Air Law and Commerce 105 (1941).

8. Cf. the court's summary of the Board's argument in Hawaiian Airlines v. Trans-Pacific Airlines, D.C.D.Haw.1948, 78 F. Supp. 1, 5.

9. Chairman of the Legislative Committee of the Interstate Commerce Commission testifying, Hearings, supra, note 6, at 70.

*of new language."* (Emphasis supplied.) He continued that the pending section "with respect to unfair methods of competition is, I believe, substantially a duplicate of the provisions under the Federal Trade Commission Act, by which the Commission is empowered to prevent unfair methods of competition in ordinary industrial enterprises. I have not studied the decisions of the Federal Trade Commission enough so that I have any clear idea of how far the question of unfair methods of competition may go; and that is another matter I should like to go further into. But I see no reason, if kept within proper limits, why that provision is objectionable." [10]

■ Thus it adapted to meet prospective needs § 5 of the Federal Trade Commission Act [11] and with it, the body of law which had grown up around it. Senator Truman told the Senate, and all parties here concede, that § 411 was so modeled, and we will therefore look to the decisions construing that section to discern the allowable limits for our action.

### III

"Section 5 of the Federal Trade Commission Act does not provide private persons with an administrative remedy for private wrongs." Federal Trade Comm. v. Klesner, 1929, 280 U.S. 19, 25, 50 S.Ct. 1, 3, 74 L.Ed. 138. "In determining whether a proposed proceeding will be in the public interest the Commission exercises a broad discretion. But the mere fact that it is to the interest of the community that private rights shall be respected is not enough to support a finding of public interest. To justify filing a complaint the public interest must be specific and substantial." Id., 280 U.S. at page 28, 50 S.Ct. at page 4.

See also, Federal Trade Comm. v. Royal Milling Co., 1933, 288 U.S. 212, 217, 53 S. Ct. 335, 77 L.Ed. 706. "This requirement is not satisfied by proof that there has been misapprehension and confusion on the part of purchasers, or even that they had been deceived—the evidence commonly adduced by the plaintiff in 'passing off' cases in order to establish the alleged private wrong. . . . But to justify the Commission in filing a complaint under section 5, the purpose must be protection of the public." Federal Trade Comm. v. Klesner, supra, 280 U.S. at page 27, 50 S.Ct. at page 3.

"The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as *against* public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade." Federal Trade Comm. v. Gratz, 1920, 253 U.S. 421, 427–428, 40 S.Ct. 572, 575, 64 L.Ed. 993.[12]

■ What may be " 'unfair methods of competition' " will not admit of precise definition and "are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." A. L. A. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 533, 55 S.Ct. 837, 844, 79 L.Ed. 1570. Protection of the public interest is made of

10. Id. at 74.

11. 15 U.S.C.A. § 45.

12. For other instances of practices found to constitute unfair methods of competition, see Federal Trade Comm. v. Royal Milling Co., 1933, 288 U.S. 212, 217, 53 S.Ct. 335, 77 L.Ed. 706; Federal Trade Comm. v. R. F. Keppel & Bro., 1934, 291 U.S. 304, 310 et seq. 54 S.Ct. 423, 78 L.Ed. 814; Federal Trade Comm. v. Cement Institute, 1948, 333 U.S. 683, 690, 691, 68 S.Ct. 793, 92 L.Ed. 1009, and cases cited; cf. Federal Trade Comm. v. Bunte Bros., 1941, 312 U.S. 349, 354, 61 S.Ct. 580, 85 L.Ed. 881.

paramount importance, Federal Trade Comm. v. Raladam Co., 1931, 283 U.S. 643, 648, 51 S.Ct. 587, 75 L.Ed. 1324, and even if the Board finds the existence of some unfair method of competition, it "still may not proceed, unless it further appear that a proceeding would be to the interest of the public, and that such interest is specific and substantial." Id., 283 U.S. at page 649, 51 S.Ct. at page 590.[13]

The principles thus enunciated lose none of their force because of the 1938 amendment to § 5 of the Federal Trade Commission Act, indeed they are emphasized in their applicability to the consumer rather than merely to the merchant or the manufacturer. See Federal Trade Comm. v. A. P. W. Paper Co., 1946, 328 U.S. 193, 199 note 4, 66 S.Ct. 932, 90 L.Ed. 1165. In the light of such teaching, therefore, we must approach our present problem. We have found no case with a reach such as is here sought to be applied, indeed it would appear there has been no previous Board decision in which the Board has so sweepingly extended its sway.[14]

## IV

If this were a private suit in which American had charged North American with trade-mark infringement and unfair competition, we would be bound to weigh considerations differing from the public interest criteria which must govern our opinion. Myriad cases in the first named categories have compelled the notice of the courts, as may be demonstrated by reference to a few recent decisions.[15] "For our purposes, cases brought in the federal courts in the field of unfair competition (not including Federal Trade Commission cases) may be divided into six categories . . .." said the court in Philco Corporation v. Phillips Mfg. Co., 7 Cir., 1943, 133 F.2d 663, 666, 148 A.L.R. 125, and fruitful reference may be made to the analysis found at pages 666–667 of 133 F.2d. Developments in this field are also discussed at interesting and valued length by Judge Frank, concurring, in Standard Brands v. Smidler, 2 Cir., 1945, 151 F.2d 34, 37. He observes, Id., at page 38 note 2, "The trade-name monopolies arising under the Federal Trade Commission Act are in a different category." If this were a private suit, whether American's registration of "American Airlines" as a service mark gives it anything more than a procedural advantage, Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 324, 59 S.Ct. 191, 83 L.Ed. 195, whether the Lanham Act, 15 U.S.C.A. §§ 1051–1127, confers a new federal right against unfair competition, Charles D. Briddell, Inc., v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 421, or whether the mere likelihood of confusion of the public as between the goods and services

---

13. It would seem that the function of the Board like that of the Commission in situations such as this has limitations; certainly under the guise of prohibiting unfair or deceptive practices or unfair methods of competition, it may not impose a code of fair competition upon an industry. Cf. A. L. A. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 531–533, 55 S.Ct. 837, 79 L.Ed. 1570; New American Library of World Literature v. Federal Trade Comm., 2 Cir., 1954, 213 F.2d 143.

14. See note 2, supra.

15. Hyde Park Clothes, Inc., v. Hyde Park Fashions, Inc., 2 Cir., 1953, 204 F.2d 223, certiorari denied, 1953, 346 U.S. 827, 74 S.Ct. 46, 98 L.Ed. 351; Charles D. Briddell, Inc., v. Alglobe Trading

Corp., 2 Cir., 1952, 194 F.2d 416; Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517; S. C. Johnson & Son, Inc., v. Johnson, 2 Cir., 1940, 116 F. 2d 427; Q-Tips, Inc., v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 114, certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377; Radio Shack Corp. v. Radio Shack, 7 Cir., 1950, 180 F.2d 200; Best & Co. v. Miller, 2 Cir., 1948, 167 F. 2d 374; McGraw-Hill Pub. Co. v. American Aviation Associates, 1940, 73 App. D.C. 131, 117 F.2d 293; Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc., 2 Cir., 1955, 221 F.2d 464; G. B. Kent & Sons v. P. Lorillard Co., D.C.S.D.N.Y.1953, 114 F.Supp. 621, affirmed, 2 Cir., 1954, 210 F.2d 953.

of the parties will predicate relief, may become important or even controlling factors after test by appropriate defenses.

But we are not here concerned with the possibility that American might prevail in private litigation, and nothing we say is intended to bear one way or the other upon issues which might develop in such an action. The Board in its brief tells us that "Petitioner's name is differentiated from intervenor's only by the addition of a one-syllable prefix." It cites cases accordingly. Material Men's Mercantile Ass'n v. New York Material Men's Mercantile Ass'n, 1st Dept. 1915, 169 App.Div. 843, 155 N.Y.S. 706, 710; American Thread Co. v. North American Thread Co., D.C.S.D.N.Y.1935, 33 F. Supp. 616; Speed Products Co. v. Tinnerman Products, 2 Cir., 1949, 179 F.2d 778, 780; American Home Benefit Ass'n v. United American Benefit Ass'n, 1942, 63 Idaho 754, 125 P.2d 1010; Northern Metal Co. v. Maier, 1940, 337 Pa. 257, 11 A.2d 140; Navy Club v. All-Navy Club, D. C.D.R.I.1949, 85 F.Supp. 679, 682. But were we to say that private injury criteria must govern the issue here, we would also be bound to observe that these and offsetting cases point up clearly that there is no inflexible rule and the circumstances in each situation must be considered. See, e. g., McGraw-Hill Pub. Co. v. American Aviation Associates, 1940, 73 App.D.C. 131, 117 F.2d 293; ("American Aviation" and "Aviation"); Pure Oil Co. v. The Pep Boys, 1942, 76 U.S.App.D.C. 19, 128 F.2d 34; Eastern Wine Corp v. Winslow-Warren, Ltd., 2 Cir., 1943, 137 F.2d 955, 956, certiorari denied, 1943, 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452 ("Chateau Martin" and "Chateau Montay"); Fawcett Publications v. Bronze Publications, 5 Cir., 1949, 173 F.2d 778, certiorari denied, 1949, 338 U.S. 869, 70 S.Ct. 144, 94 L. Ed. 533 ("True Confessions" and "Bronze Confessions"); Coca-Cola Co. v. Snow Crest Beverages, 1 Cir., 1947, 162 F.2d 280, certiorari denied, 1947, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 ("Coca-Cola" and "Polar Cola").

Even in the last named cases the test could be said to be whether the addition of a prefix or an extra nominate term renders the corporate name "so distinct that confusion is unlikely." Pure Oil Co. v. The Pep Boys, supra, 76 U.S.App.D. C. 19, 128 F.2d 34.

Perhaps the injection of one additional idea will suffice to show how murky are the waters in which the Board would fish. In Columbia Mill Co. v. Alcorn, 1893, 150 U.S. 460, 466, 14 S.Ct. 151, 153, 37 L.Ed. 1144, the Court said: "The appellant was no more entitled to the exclusive use of the word 'Columbia' as a trade-mark than he would have been to the use of the word 'America,' or 'United States,' or 'Minnesota,' or 'Minneapolis.' These merely geographical names cannot be appropriated, and made the subject of an exclusive property." Cf. Durable Toy & Novelty Corporation v. J. Chein & Co., 2 Cir., 1943, 133 F.2d 853, 855, certiorari denied, 1943, 320 U. S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849, where Judge Learned Hand pointed out that ". . . 'Uncle Sam' is part of the national mythology, not entirely unlike the flag, or any other part of our inherited patriotic paraphernalia; all have a measurable interest in its use"; Patton Paint Co. v. Sunset Paint Co., 1923, 53 App.D.C. 348, 351, 290 F. 323, where this court considered "Sun" as publici juris. Congress "has been given no power to legislate upon the substantive law of trade-marks," and it reasonably may be assumed that "the intention was to allow the registration of such marks as that law, and the general law of unfair competition of which it is a part, recognized as legitimate." American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 381, 46 S.Ct. 160, 162, 70 L.Ed. 317. The Court continued, 269 U.S. at page 383, 46 S.Ct. at page 163, "There may be, of course, instances where a single word in the corporate name has become so identified with the particular corporation that, whenever used, it designates to the mind of the public that particular corporation. But here it is not shown that,

standing alone, the word 'Simplex' has that effect; that it is any more calculated to denote to the public the defendant corporation than any of the other corporations in the names of which it is likewise embodied; or, indeed, that it signifies the appropriation of some corporate name though incapable of exact identification."

There are many instances, of which the public must be presumed to have knowledge, of similarities in airlines designations indicating a not uncommon practice of this sort in the air transportation industry. Exhibits in the record here disclose airlines routes allocated by the Board to All American Airways, Inc., American Airlines, Inc., Northeast Airlines, Inc., Eastern Air Lines, Inc., Northwest Airlines, Inc. and Western Airlines, Inc. Pan American and Air American were previously mentioned.[16] Phonetic differences, lack of emphasis in petitioner's use of the disputed term, possible failure of the intervenor's advertising campaigns, differences in service, rates and the elements of the airlines traveling public each has sought to reach, would seem to serve here to distinguish the two competing companies. Were we to continue this collateral discussion we might observe with the court in Eastern Wine Corp v. Winslow-Warren, Ltd., 2 Cir., 1943, 137 F.2d 955, 960, certiorari denied, 1943, 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452: "The issue in such a case as this is 'whether an appreciable number of prospective purchasers of the goods * * * are likely' to be confused. 'That a few particularly undiscerning prospective purchasers might be so misled is not enough.'" Even in such adversary litigation between competitors, the obligation resting upon one is not to insure that every purchaser will distinguish it from its competitor, but only to use "reasonable means to prevent confusion." Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 121, 59 S.Ct. 109, 115, 83 L.Ed. 73: "A new competitor is not held to the obligations of an insurer against all possible confusion. He is not obligated to protect the negligent and inattentive purchaser from confusion resulting from indifference. Skinner Mfg. Co. v. General Foods Sales Co., Inc., D.C., 52 F.Supp. 432, 433, 450. It has been said that he is not required to make the market 'foolproof.' [Citing cases.] '* * * Instead, they are required only to mark or designate them in such manner that purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken. * * *'" Life Savers Corp. v. Curtiss Candy Co., 7 Cir., 1950, 182 F.2d 4, 8. See also, McGraw-Hill Pub. Co. v. American Aviation Associates, 1940, 73 App. D.C. 131, 117 F.2d 293.

Against the foregoing background, perhaps already too extensively portrayed, one thing seems crystal clear: that if Congress has "been given no power to legislate upon the substantive law of trade-marks" it is utterly unlikely that Congress constituted the Board a forum to adjudicate the complicated issues arising in this field. We will not say that under no circumstances can name appropriation in simulation of or in general resemblance to the name of another air line result in an unfair trade practice or an unfair method of competition, quite the contrary.[17] But the mere

16. Exhibits in the Congressional hearings, supra, note 6, disclose air mail contractors such as North American Aviation, Inc., American Airlines, Inc., Northwest Airlines, Inc., Western Air Express Corp., Transcontinental and Western Air, Inc., National Park Airways, Inc. and National Air Transport.

17. See, e. g., Aetna Casualty & Surety Co. v. Aetna Auto Finance, 5 Cir., 1941, 123 F.2d 582, 584, certiorari denied 1942, 315 U.S. 824, 62 S.Ct. 917, 86 L.Ed. 1220, and cases cited; Greyhound Corporation v. Goberna, 5 Cir., 1942, 128 F.2d 806; Standard Oil Co. of Maine v. Standard Oil Co. of New York, 1 Cir., 1930, 45 F.2d 309; Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973, 977, and cases cited in note 1.

combination of the words "North" and "American," the latter so commonly used in business enterprises, even in the airlines industry, without more—much more than is disclosed upon this record —is not the unfair practice or the unfair method of competition over which the Board, in the public interest, has jurisdiction. Our duty is to "make certain that the legislative enactment is within Constitutional limitations, that the executive program is within statutory limitations, and that a disputed executive action is within the terms of the legislative mandate, fairly based on facts fairly found, and not arbitrary, capricious or fanciful." United Air Lines v. Civil Aeronautics Board, 1946, 81 U.S.App.D. C. 89, 91, 155 F.2d 169, 171.

## V

What Congress in the public interest sought to reach in its original § 411 of the Act may be illustrated by what was said of the recent amendment extending the provision to "ticket agents."[18] Types of practices and abuses were carefully spelled out,[19] each of the sort for which a public body might be expected to provide a remedy in the public interest where resort by an individual to the courts would largely be fruitless or impracticable. As the Federal Trade Commission Act's § 5 had been made the model, so, too, in the Civil Aeronautics Act, § 411 was a novelty. It was a "new device" introduced by Congress "in the hope thereby of remedying conditions in business which a great majority of the

18. Act of July 14, 1952, 49 U.S.C.A. § 491.
19. House Rep. No. 2420, 82d Cong., 2d Sess. (1952), reads in part:

"The necessity for the proposed legislation is occasioned by the fact that a number of ticket agents have engaged in flagrant abuses and deceptions in the sale of air transportation to the great detriment of the public. For example, ticket agents have engaged in such practices as the following:

"(1) Deceptive advertising and other public representations which induce the public to believe that the agent is an air carrier and to rely on such agent to provide the air transportation service offered when in fact the agent is not authorized to engage in air transportation but is depending upon the performance of the service by some authorized air carrier undisclosed to the prospective passenger and in many instances unknown to the agent at the time the representation is made or the same is consummated.

"(2) Deceptive and misleading advertising and other public representation as to the quality and kind of service, cost, type and size of aircraft, times of departure and arrival, points served, route to be flown, stops to be made, and total trip time from point of departure to designation.

"(3) Offer and sale of air transportation without regard to the rates, fares, and charges specified in the tariffs of air carriers represented, discriminating between passengers, charging some more and some less than lawful tariff rates, demanding and collecting extra improper charges which in some instances are

exacted to make up the difference between the lower rate offered purposely as a 'come-on' to bring the prospective purchaser to the agent's place of business and the correct rate which should have been advertised to the public.

"(4) Selling air transportation on a reservation basis when the agent has no binding commitment with any air carrier to provide the service. In such instances the passenger is later informed that the flight will be delayed, or he finds upon arrival at the airport that there is no space for him, or that there is no flight as represented. The passenger then must wait until the agent finally arranges for this passage on another flight or another carrier which may be hours or days later and may be at a higher fare or under less desirable circumstances or on less desirable types of aircraft than that represented at the time of sale.

"(5) Falsely representing that passengers are directly insured in large amounts when in fact no such insurance is in force.

"(6) Falsely representing that special 'priorities' for reservations and special discounts are available, particularly for persons in military service when in fact no such special considerations are available.

"(7) Failure and refusal to make proper refunds when flights are not available or only partially completed.

"These practices arose with the development of the irregular air carrier operations after the close of World War II and have become more widespread and serious each year. . . ."

American people regarded as menacing the general welfare, and which for more than a generation they had vainly attempted to remedy by the ordinary processes of law. It was believed that widespread and growing concentration in industry and commerce restrained trade, and that monopolies were acquiring increasing control of business." Mr. Justice Brandeis, dissenting, in Federal Trade Comm. v. Gratz, 1920, 253 U.S. 421, 432, 40 S.Ct. 572, 576, 64 L.Ed. 993. It would seem that without more, protection by the Board of a name monopoly, employing the vast force of the United States in its support, is far outside the scope of the powers entrusted to the Board. Especially do we so conclude upon reconsideration of the Act's pertinent policy declarations, set forth in note 2, supra.

We are reinforced in our conviction by a review of the leading cases [20] in which the Supreme Court has clearly taught the nature and the substance of the public interest to be considered and the criteria to be applied in proceedings under the Federal Trade Commission Act. Since that body of law likewise surrounds the bare bones of § 411 of the Act before us, we must be guided accordingly. Given an order in a case which falls within the standards of illegality thus connoted, with adequate explanation of the reasons why the public interest demands such an order, and a determination based upon adequate supporting evidence that the respondent has engaged in the conduct to be condemned, we will sustain the Board. This is not such a case, and when as a matter of law we so conclude, it is our duty to set aside the Board's order. We do so.

Reversed.

### APPENDIX

The following succinct summary of some of the leading cases referred to in note 20 of the opinion may prove of convenience to counsel.

Federal Trade Comm. v. Gratz, 1920, 253 U.S. 421, 425, 40 S.Ct. 572, 574, 64 L.Ed. 993, affirmed a court of appeals decision holding that the Commission "has no jurisdiction to determine the merits of specific individual grievances."

Federal Trade Comm. v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, enforced a Commission order against a resale price maintenance scheme which suppressed competition and obstructed a free flow of commerce.

Federal Trade Comm. v. Winsted Hosiery Co., 1922, 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729, enforced a Commission order where goods, falsely branded as "Natural Merino" or otherwise as wool in fact were largely cotton.

Federal Trade Comm. v. Eastman Kodak Co., 1927, 274 U.S. 619, 47 S.Ct. 688, 71 L.Ed. 1238, held that the Board had no power to order the Company to divest itself of physical property acquired prior to Commission action even though the property acquired and held was in furtherance of a scheme of unfair competition. At page 623 of 274 U.S., at page 689 of 47 S.Ct. the Court said: "The Commission exercises only the administrative functions delegated to it by the Act, not judicial powers. [Citing cases.] It has not been delegated the authority of a court of equity."

Federal Trade Comm. v. Klesner, 1929, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, refused enforcement where mere confusion in competing business names failed to establish "specific and substantial" public interest.

Federal Trade Comm. v. Raladam Co., 1931, 283 U.S. 643, 652–653, 51 S.Ct. 587, 592, 75 L.Ed. 1324, denied enforcement of an order against a dangerously misleading obesity "cure" where there was a failure of demonstration that advertising "subtantially injured, or tended thus to injure, the business of any competitor or of competitors generally . . .." Compare Federal Trade Comm. v. Raladam Co., 1942, 316 U.S. 149, 62 S.Ct. 966, 86 L.Ed. 1336.

---

20. See appendix.

Federal Trade Comm. v. Royal Milling Co., 1933, 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706, enforced an order against respondents who called themselves milling companies but ground no grain, thus deceiving the public.

Federal Trade Comm. v. Algoma Co., 1934, 291 U.S. 67, 54 S.Ct. 315, 317, 78 L.Ed. 655, enforced a Commission order against some fifty manufacturers with widespread market who resorted to use of a trade name " 'California White Pine' " upon a much inferior and cheaper species of pine, resulting in complete misrepresentation of the thing supplied.

Federal Trade Comm. v. R. F. Keppel & Bro., 1934, 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814, enforced an order against unlawful competition by many manufacturers of candy who enticed children to buy through resort to a sales scheme which included a chance of their getting their money back.

Federal Trade Comm. v. Standard Education Society, 1937. 302 U.S. 112, 58 S. Ct. 113, 82 L.Ed. 141, enforced a Commission order against false representations, inter alia, that books were free where many teachers and others testified to being deceived and deluded.

Federal Trade Comm. v. Bunte Bros., 1941, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881, refused an order against an intra-state candy sale scheme, like that in the Keppel case, but referred to examples of unfair competition, "which run the gamut from bribing employees of prospective customers to selling below cost for hindering competition." 312 U.S. at page 354, note 4, 61 S.Ct. at page 583.

Fashion Originators' Guild v. Federal Trade Comm., 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, held that purposes and practices contrary to the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note and the Clayton Act, 15 U.S.C.A. § 12 et seq., were within the Commission's jurisdiction where one hundred seventy six manufacturers and thousands of retailers combined to restrain competition, especially where an organized boycott of nonconforming competitors had a tendency to create monopoly.

Jacob Siegel Co. v. Federal Trade Comm., 1946, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888, outlined the problem presented upon judicial review where the Commission had failed to consider or make findings as to whether a trade name, Alpacuna, could be saved.

Federal Trade Comm. v. A. P. W. Paper Co., 1946, 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165, refused enforcement of a Commission order forbidding the use of "Red Cross" in advertising where there was no fraud but where some of the public thought that goods were made in accordance with standards of, or by virtue of some connection with, the American Red Cross. And see page 199 of 328 U.S., page 935 of 66 S.Ct. and note 4 concerning the effect of the 1938 amendment to the Federal Trade Commission Act.

Price differential problems under the Robinson-Patman Act, Federal Trade Comm. v. Morton Salt Co., 1948, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196; Federal Trade Comm. v. Ruberoid Co., 1952, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081; Federal Trade Comm. v. Minneapolis-Honeywell Co., 1952, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245, where Commission orders were sustained, may be compared with those in Standard Oil Co. v. Federal Trade Comm., 1951, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239, and Automatic Canteen Co. v. Federal Trade Comm., 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454, where enforcement was refused. Exclusive contracts as restraint of competition and possessing a tendency to monopoly were considered in Federal Trade Comm. v. Motion Picture Advertising Service Co., 1953, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426, and comparable questions in yet other cases we need not cite.